******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* EUGENE L. WALKER
## (AC 39797)

Alvord, Kahn and Bear, Js.

*Syllabus*

Convicted of the crimes of felony murder, manslaughter in the first degree with a firearm, attempt to commit robbery in the first degree and criminal possession of a pistol or revolver, the defendant appealed. The defendant's conviction stemmed from his alleged involvement with that of his codefendant, A, in the shooting death of the victim during an attempted robbery in a parking lot. The defendant, who was wearing a bandana and carrying a revolver, and A's cousin, D, had approached the victim's Acura, and a struggle ensued during which the victim was shot. A bandana that the police recovered from the Acura, the victim's bloodstain, and known samples that included buccal swabs from the defendant, A and D were sent to a state laboratory, where they were analyzed by a supervisory forensics examiner, H, and the laboratory's known processing group. H determined that the defendant's DNA profile matched the DNA found on the bandana. H testified about her findings and the DNA profile that another analyst in the laboratory had generated from the defendant's buccal swab. M, who knew the defendant only by a nickname, identified the defendant during her testimony, which occurred after she previously had met with the prosecutor in his office. During a discussion about the defendant in the prosecutor's office, M had identified the defendant by his nickname from a photograph that was on the prosecutor's desk. On appeal, the defendant claimed, inter alia, that the trial court violated his right to confrontation by permitting H to testify about a DNA sample that had been processed by a different analyst. The defendant also claimed that the trial court improperly denied his motion to sever his trial from that of A after the trial court had admitted into evidence certain statements of A under the coconspirator exception to the rule against hearsay. *Held*:

1. The defendant could not prevail on his unpreserved claim that the trial court violated his right to confrontation by allowing H to testify about a DNA sample that was processed by another analyst in the same laboratory without requiring that analyst to testify; H, who had conducted the critical analysis and made the findings that connected the defendant's DNA to the DNA found on the bandana, testified about the standard operating procedures of the laboratory, including the manner in which the known samples were processed and verified, she relied on her personal knowledge of the procedures performed by the analysts in the known processing group in reaching her own conclusions, her analysis was reviewed by another analyst at the laboratory who signed her report, and even if H's testimony about the processing of the defendant's known profile was considered a critical stage of the analysis or chain of custody, it did not implicate the confrontation clause because H was available and testified extensively on cross-examination.

2. The defendant's claim that the trial court violated his right to a fair trial by declining to grant his motion for a mistrial or to strike M's in-court identification of him was unavailing:

   a. M's pretrial identification of the defendant in the prosecutor's office did not result from an unnecessarily suggestive identification procedure and, thus, her subsequent in-court identification of the defendant did not violate his due process rights; M was not an eyewitness to the crimes at issue, she identified the defendant in the prosecutor's office, and then in court, as the person she knew by a certain nickname, and the prosecutor did not ask M to identify the individual in the defendant's photograph, but instead, M's identification occurred spontaneously as a result of her familiarity with the individual she knew by the nickname, and not as the result of an arranged procedure by law enforcement.

   b. The trial court did not abuse its discretion in declining to strike M's in-court identification of the defendant or to declare a mistrial as sanctions for the state's failure to disclose M's pretrial identification of the defendant's photograph in the prosecutor's office: the defendant did

not demonstrate that the prosecutor violated the rule of practice (§ 40-13A) that requires the prosecuting authority, upon written request of a defendant, to provide photocopies of all statements, law enforcement reports and affidavits within its possession concerning the offense charged, as the record did not indicate that the defendant made a written request as required by § 40-13A, and M's comment to the prosecutor made prior to trial identifying the defendant was not a discoverable statement pursuant to § 40-13A because M's comment to the prosecutor was oral and the record did not contain evidence that it had been recorded, and even if the prosecutor improperly withheld M's statement from defense counsel, the defendant did not show any prejudice, as the jury reasonably could have found that M knew the defendant prior to the victim's murder.

3. The defendant could not prevail on his claim that the trial court erred in admitting certain hearsay testimony under the coconspirator exception to the hearsay rule, which was based on his claim that the court improperly concluded that a conspiracy existed when it admitted that testimony under the coconspirator exception; that court did not err in its preliminary determination that a conspiracy existed, as the court admitted the hearsay testimony subject to the state's later admission of sufficient foundational evidence and the state later introduced the necessary connecting facts, the record did not indicate that the court improperly considered the hearsay statements in its analysis, and although the court mentioned coconspirator hearsay statements in addition to independent evidence when it discussed whether the state had established the existence of a conspiracy by a preponderance of the evidence, the court based its ruling only on independent evidence.

4. The defendant could not prevail on his unpreserved claim that the trial court improperly denied his motion to sever his trial from that of A, which was based on his assertion that evidence was admitted that would not have been admissible against him at a separate trial; although the trial court clearly raised potential joint trial issues with counsel, defense counsel reassured the trial court that such problems would not arise, the defendant was not substantially prejudiced by the admission of A's statements so as to require a separate trial, as certain of A's statements were admissible against the defendant under the coconspirator exception to the hearsay rule, and the court's curative instructions to the jury did not identify the defendant but were directed toward A.

5. The trial court did not abuse its discretion in admitting into evidence a photograph of the bandana, the bandana and the DNA evidence that was derived from it; the police officer who testified that the photograph was a fair and accurate representation of what she personally had observed in the Acura was a competent witness, as her testimony provided a proper foundation for the admission of the photograph, and there was a sufficient chain of custody for the admission of the bandana and, by extension, the DNA evidence derived from the bandana.

6. The defendant's conviction of felony murder and manslaughter in the first degree violated the constitutional provision against double jeopardy, as the conviction of both charges arose from the single act of killing the victim; accordingly, the conviction of manslaughter in the first degree was vacated and the case was remanded to resentence the defendant.

Argued September 7, 2017—officially released March 20, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, manslaughter in the first degree with a firearm, manslaughter in the first degree, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, carrying a pistol without a permit and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, *Iannotti, J.*, granted the state's motion to consolidate the case with the case of a codefendant; thereafter, the state filed a substitute information charging the defendant with the crimes of felony murder, manslaughter in the first degree with a firearm, attempt to commit

robbery in the first degree, conspiracy to commit robbery in the first degree, carrying a pistol without a permit and criminal possession of a pistol or revolver; subsequently, the matter was tried to the jury before *Markle, J.*; thereafter, the court, *Markle, J.*, denied the defendant's motions to sever and for a mistrial; subsequently, the court, *Markle, J.*, granted the defendant's motion for a judgment of acquittal as to the charge of carrying a pistol without a permit; verdict of guilty of felony murder, manslaughter in the first degree with a firearm, attempt to commit robbery in the first degree and criminal possession of a pistol or revolver; thereafter, the court, *Markle, J.*, denied the defendant's motions for a judgment of acquittal and a new trial, and rendered judgment in accordance with the verdict, from which the defendant appealed. *Reversed in part; judgment directed; further proceedings.*

*Damian K. Gunningsmith*, with whom were *John L. Cordani, Jr.*, and, on the brief, *Moira L. Buckley*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, and *Cornelius P. Kelly*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Eugene L. Walker, appeals from the judgment of conviction, rendered following a jury trial, of felony murder in violation of General Statutes § 53a-54c; manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a); attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2); and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). The defendant claims that the trial court (1) violated his right to confrontation by permitting a laboratory analyst to testify regarding a known DNA sample processed by another analyst in the same laboratory; (2) violated his right to due process when it declined to either strike certain testimony or grant the defendant's motion for a mistrial; (3) erred in admitting certain testimony under the coconspirator exception to the hearsay rule; (4) erred in denying his motion to sever his trial from that of his codefendant; (5) erred in admitting certain evidence at trial; and (6) violated double jeopardy by convicting him of both manslaughter and felony murder. We affirm the judgment in part, and we reverse the judgment in part.

The following facts and procedural history are relevant to our resolution of this appeal. On the night of October 28, 2012, Anthony Adams, the codefendant in this consolidated trial, telephoned Alexis Morrison to ask if she knew "somebody that could sell him some weed." Morrison called Neville Malacai Registe, the victim, to arrange for him to meet with Adams in the parking lot of her West Haven residence. When the victim received Morrison's telephone call, he was with his friend, Stephon Green, at his mother's home in New Haven. After some time, the victim and Green left in the victim's Acura. As they approached the designated parking lot, the victim called Morrison. Morrison then telephoned Adams to tell him that the victim "was there." Adams replied that he had already left because the victim "took too long . . . and that Day-Day and GZ [were] going to get the weed." "Day-Day" and "GZ" were nicknames for Daquane Adams, who is Anthony Adams' cousin, and the defendant, respectively, both of whom Morrison knew.

When the victim and Green arrived in the parking lot, the victim backed his car into a parking space. Green, who was rolling a marijuana joint in the front passenger seat, looked up and noticed two men approaching the Acura. He returned his attention to his task, and the victim opened the driver's door to talk to one of the men. The man, who was wearing a black bandana and who was later identified as the defendant, held a revolver inside the car and said, "run it," meaning, "give me it. It's a robbery . . . ." A physical altercation ensued. The second man, later identified as Daquane

Adams, stepped away from the Acura and placed a cell phone call to someone. A Toyota arrived, and a third man exited that car and asked the defendant for the gun.[1] The struggle over the gun continued inside the victim's Acura, and someone knocked Green into the backseat. Daquane Adams and the third man pulled the defendant out of the car and, as Green was climbing back into the front passenger seat, a shot was fired. Green heard the victim say, "oh, shit," and then heard a second shot.

The defendant, Daquane Adams, and the third man got in the Toyota and drove toward the parking lot exit. With the victim slumped over in the driver's seat, Green pursued the Toyota. He caught up to it at the end of the street and rammed the Acura into the back of the Toyota. The victim's Acura was disabled, but the Toyota was able to be driven away. The victim died of a gunshot wound to his head.

The defendant's case was consolidated for trial with that of his codefendant, Anthony Adams.[2] Following trial, the jury found the defendant guilty of felony murder, manslaughter in the first degree with a firearm, attempt to commit robbery in the first degree, and criminal possession of a pistol or revolver. The jury found him not guilty of the charge of conspiracy to commit robbery. The court imposed a total effective sentence of forty-five years incarceration followed by ten years special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that he was deprived of his right to confrontation under the federal constitution when the court permitted a forensic science examiner to testify about the results of a comparison she made between (1) a DNA profile she generated from crime scene evidence and (2) a DNA profile another analyst in the laboratory generated from the defendant's buccal swab, without requiring the other analyst to testify.[3] We disagree.

The following additional facts that the jury reasonably could have found are relevant to this claim. The police recovered a black bandana from the Acura and sent the bandana and the victim's bloodstain to the state's Division of Scientific Services laboratory for analysis. The police also obtained and sent additional known samples to the laboratory, including buccal swabs from the defendant, his codefendant and Daquane Adams. Although Heather Degnan, a supervisory forensics examiner, visually inspected all of the samples, including the buccal swab obtained from the defendant, per standard laboratory procedure the known samples were processed by the laboratory's "known processing group" (group). Degnan processed the bandana using the standard forensic DNA typing

techniques used in the laboratory. She isolated DNA from two sites on the bandana and generated DNA profiles (evidentiary profiles) that contained a mixture of DNA from at least two contributors, one of which was deemed a major contributor and the other, a minor contributor. An analyst in the group generated DNA profiles from the known samples (known profiles) and sent them to Degnan. Degnan compared the evidentiary profiles she had extracted from the DNA on the bandana with the known profiles. Degnan's analysis determined that the defendant was included as a major contributor to the DNA that was on the bandana.[4] She also entered the evidentiary profile of the major contributor to the DNA found on the bandana into the Connecticut and national DNA databases[5] and obtained a "hit" for the defendant because his DNA profile had been entered due to a prior felony conviction. Degnan prepared a report summarizing her findings.[6]

At trial, Tammy Murray, the detective who took the buccal swab from the defendant, testified that she obtained a subpoena for nontestimonial evidence and testified about the established procedure she followed to take the sample from the defendant. The buccal swab itself was introduced into evidence along with the bandana. After Murray's testimony, the state called Degnan to testify about her analysis and findings. She first testified about the procedures she followed when analyzing the DNA found on the bandana. Degnan explained that she swabbed the bandana and generated an evidentiary profile from each side of the bandana, and that the group processed and generated the known profiles from the defendant's buccal swab and the victim's bloodstain. According to Degnan, this division of tasks took place according to "standard operating procedure." The group then provided the known profiles to Degnan for comparison with the evidentiary profiles.

Prior to the admission of Degnan's findings, defense counsel objected to Degnan's testimony and the admission of her report on the grounds that Degnan was not competent to testify about the known profiles and that there was a lack of foundation for this evidence. Specifically, the defendant's counsel objected because Degnan had not been formally qualified as an expert. Counsel for Anthony Adams objected on the ground that Degnan did not process the known samples herself but, rather, obtained the results "second hand."[7] The court, *Markle, J.*, overruled the objections and allowed Degnan to testify as to the results of her analysis.

Degnan testified that, on the basis of her analysis and comparison, the defendant was a major contributor to the DNA found on both sides of the bandana. On cross-examination, Degnan elaborated that she had "examined the known samples and then sent those samples to the known processing group for extraction and amplification," but had not been present for that stage of the

process. She was, however, familiar with the group's functions. She noted that the laboratory's use of known control samples ensured that the machines used in the testing processes were working properly. She further explained that whenever a DNA profile is generated, including a known profile, it is analyzed independently by a second analyst, who also reviews the paperwork associated with that analysis to determine if the initial analyst generated the profile properly. Degnan's analysis of both the evidentiary and known profiles was independently reviewed by Dahong Sun, another DNA analyst at the laboratory, who cosigned Degnan's report. The court admitted Degnan's report[8] containing her findings but redacted it to eliminate references to the known samples of the other defendants, Anthony Adams and Daquane Adams.

On appeal, the defendant claims that he was deprived of his right to confrontation under the sixth amendment to the federal constitution when the court permitted Degnan to testify about the results of her comparison of the DNA profiles, without requiring an analyst from the known processing group to testify. The state argues that the defendant's confrontation claim was not preserved because it was not raised at trial and was not subsumed within the defendant's evidentiary objections regarding lack of competence and foundation.[9] The state further claims that had the defendant properly presented his claim as one of confrontation that was based on testimonial hearsay, as opposed to a challenge to Degnan's competence to render an opinion regarding the known profile, the state may have chosen to call the known processing group analyst, assuming he or she was available to testify.[10] The state argues that raising the confrontation issue for the first time on appeal amounts to an ambush on the state and the trial court. Nonetheless, as the state concedes, our Supreme Court has reviewed a confrontation claim under the bypass rule of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), even when there was a claim of waiver. *State* v. *Smith*, 289 Conn. 598, 619, 960 A.2d 993 (2008); see also *State* v. *Holley*, 327 Conn. 576, 590, 175 A.3d 514 (2018). We will, therefore, review this unpreserved claim pursuant to *Golding*, as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant claims that

the court violated his right to confrontation by allowing Degnan to testify about the results of the comparison she made, without anyone from the known processing group being called to testify. Because Degnan, the analyst who conducted the critical analysis and made the resulting findings, testified and was subject to cross-examination, we conclude that there was no confrontation clause violation, and thus this claim fails under the third prong of *Golding*. See id., 240.

The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." The sixth amendment right of confrontation extends to the states through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

"In *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity [to cross-examine the witness who is otherwise] unavailable to testify at trial. Id., 68. In adopting this categorical approach, the court overturned existing precedent that had applied an open-ended balancing [test] . . . conditioning the admissibility of out-of-court statements on a court's determination of whether the proffered statements bore adequate indicia of reliability. . . . Although *Crawford*'s revision of the court's confrontation clause jurisprudence is significant, its rules govern the admissibility only of certain classes of statements, namely, testimonial hearsay." (Citations omitted; internal quotation marks omitted.) *State* v. *Buckland*, 313 Conn. 205, 212–13, 96 A.3d 1163 (2014), cert. denied, U.S. , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015). Even where the subject statement is testimonial hearsay, "[t]he [confrontation] [c]lause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford* v. *Washington*, supra, 60 n.9.

In the context of laboratory tests, "the analysts who write reports that the prosecution introduces must be made available for confrontation . . . ." *Bullcoming* v. *New Mexico*, 564 U.S. 647, 661, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). Nevertheless, "it is not the case . . . that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 311 n.1, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Although "[i]t is the obligation of the prosecution to establish the chain of custody . . . this does not mean that everyone who

laid hands on the evidence must be called. . . . [G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." (Citations omitted; internal quotation marks omitted.) Id. As the United States Court of Appeals for the Second Circuit recently noted, "the Supreme Court has never held that the [c]onfrontation [c]lause requires an opportunity to cross-examine each lab analyst involved in the process of generating a DNA profile and comparing it with another . . . ." *Washington* v. *Griffin*, 876 F.3d 395, 407 (2d Cir. 2017); see also *State* v. *Buckland*, supra, 313 Conn. 214 ("neither *Melendez-Diaz* nor *Bullcoming* require every witness in the chain of custody to testify"). Generally, the "rules of evidence . . . permit experts to express opinions based on facts about which they lack personal knowledge . . . ." *Williams* v. *Illinois*, 567 U.S. 50, 69, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012).[11]

In the present case, Degnan, the analyst who conducted the critical analysis and made the findings that connected the defendant's DNA to the DNA found on the bandana, testified and was subject to cross-examination. Degnan explained the procedures she followed in processing the DNA found on the bandana and comparing it to the known profiles. It was Degnan, and not the analyst from the group, who conducted the forensic analysis of the known profiles and the evidentiary profile and determined that the defendant's DNA profile matched the DNA found on the bandana. See *People* v. *Corey*, 52 Misc. 3d 987, 992, 36 N.Y.S.3d 354 (2016) ("Nothing . . . supports the conclusion that the analysts involved in the preliminary testing stages, specifically, the extraction, quantification or amplification stages, are necessary witnesses . . . . Rather, it is the generated numerical identifiers and the calling of the alleles at the final stage of DNA typing that effectively accuses defendant of his role in the crime charged . . . ." [Citations omitted; internal quotation marks omitted.]). Although Degnan did not run the machines that extracted the DNA profiles from the known samples, she was fully aware of, and testified to, the standard operating procedures of the laboratory, including the manner in which the known samples are processed and verified. The defendant's known profile was not inherently inculpatory. It was the forensic analysis conducted by Degnan that made it so. Degnan was extensively cross-examined about her analysis and findings. She was specifically questioned about the processing of the known samples and her lack of participation in the generation of the known profiles. She was the primary analyst who made the findings and prepared the report, and was available to defend and explain her conclusion that the two DNA profiles matched.

Nevertheless, in support of his contention that his right to confrontation was violated, the defendant cites *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 305. This case, however, can be readily distinguished. In

*Melendez-Diaz*, the Supreme Court addressed the issue of whether a petitioner's right of confrontation was violated when the trial court admitted certificates of analysis reporting the results of a laboratory test, without the analysts who had prepared and signed the certificates appearing to testify. Id., 308–309. The court held that the notarized certificates were "a solemn declaration or affirmation made for the purpose of establishing or proving some fact"; (internal quotation marks omitted) id., 310; and thus, "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that the petitioner had a prior opportunity to cross-examine them," the petitioner's right to confrontation had been violated. (Internal quotation marks omitted.) Id., 311. In the present case, unlike in *Melendez-Diaz*, the analyst who conducted the analysis to establish "some fact" and who prepared and signed the report, testified at trial and was therefore available for cross-examination. See *Washington* v. *Griffin*, supra, 876 F.3d 401, 405 (similarly distinguishing *Melendez-Diaz* in case where analyst who testified had conducted DNA extraction of evidentiary samples but not DNA extraction of defendant's buccal swab, which she utilized in her analysis and conclusions).

Even if we assume, arguendo, that the processing of the defendant's known profile was considered a critical stage of the analysis or chain of custody, the admission of Degnan's testimony referencing it did not implicate the confrontation clause because Degnan was available and testified extensively on cross-examination. This is particularly important where, as here, the laboratory testing functions are allocated among multiple employees. Although not determinative of the outcome of this case, *Williams* v. *Illinois*, supra, 567 U.S. 50, informs our opinion. See *State* v. *Lebrick*, 179 Conn. App. 221, 244, A.3d ("[g]iven that no readily applicable rationale for the court's holding in *Williams* obtained the approval of a majority of the justices, its precedential value seems, at best, to be confined to the distinct factual scenario at issue in that case"), cert. granted on other grounds, 328 Conn. 912, A.3d (2018). "When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both." *Williams* v. *Illinois*, supra, 85. Here, only one of the three known profiles matched the crime scene evidence; the known profiles of Anthony Adams and Daquane Adams were eliminated. "When the work of a lab is divided up in such

a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." Id.

Courts have consistently held that experts may rely on other experts' findings in reaching their own independent conclusions. See *State* v. *Hutchison*, 482 S.W.3d 893, 914 (Tenn. 2016) (applying *Williams* to admission of autopsy report prepared by nontestifying medical examiner); see also *Washington* v. *Griffin*, supra, 876 F.3d 395 (testifying analyst who conducted comparisons of DNA profiles may rely on extractions conducted by other analysts without violating confrontation clause). "When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the [c]onfrontation [c]lause." *Williams* v. *Illinois*, supra, 567 U.S. 58. That is precisely what occurred in this case when Degnan relied on her personal knowledge of the procedures performed by the analysts in the group in comparing the known profiles to the evidentiary profile and reaching her own conclusions. As she noted, all DNA profiles generated by each analyst are independently reviewed by a second analyst. "[T]he knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard." Id., 85. We conclude, therefore, that the defendant's right to confrontation was not violated because Degnan, the primary analyst who performed and supervised the generation and analysis of the DNA profiles and resulting findings, testified and was available for cross-examination. Accordingly, the defendant's claim fails under the third prong of *Golding*.

## II

The defendant next claims that the court erred by declining either to strike Morrison's in-court identification of the defendant or to grant the defendant's motion for a mistrial. The defendant primarily argues that Morrison's identification of him was based on an unnecessarily suggestive procedure and, thus, by declining to strike Morrison's testimony or to declare a mistrial, the court violated his due process right to a fair trial pursuant to the fifth and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution.[12] Additionally, the defendant argues that the court erred by declining to strike Morrison's testimony or order a mistrial as a sanction pursuant to Practice Book § 40-5, for the state's failure to disclose that Morrison had previously identified the defendant in a photograph. We disagree.

We employ a plenary standard of review when analyzing whether a defendant was deprived of his right to

due process. *State* v. *Dickson*, 322 Conn. 410, 423, 141 A.3d 810 (2016), cert. denied,       U.S.      , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). We review the court's decision to refuse to impose sanctions for abuse of discretion. *State* v. *Respass*, 256 Conn. 164, 184, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

The following additional facts are relevant. Morrison testified that Anthony Adams informed her that the victim was taking too long to arrive at the parking lot, so he was leaving and "Day-Day and GZ" would instead purchase the marijuana. Morrison knew that Day-Day was Daquane Adams, although she did not know his last name, and that GZ was Daquane Adams' friend, whom she knew only by his nickname. She testified that, at the time of the incident, she had known Daquane Adams for a year or two, and had known the defendant for "a couple of years" and saw him "once in a blue moon." The prosecutor asked her to identify GZ in the courtroom, and Morrison identified the defendant.

Following a discussion outside the presence of the jury, defense counsel made a motion for a mistrial and a motion for severance on the grounds that Morrison's in-court identification of the defendant was inherently suggestive due to the courtroom setting and that it was a surprise, in that the state had never disclosed that Morrison would identify the defendant. The court denied the motions, reasoning that Morrison's in-court identification of the defendant was based on prior knowledge and not based on any suggestive identification procedure. With respect to Morrison's ability to identify the defendant, the prosecutor elaborated that "[l]ast week when [Morrison] was in my office . . . I had photos on my desk of all the defendants . . . . [W]e were talking about [the defendant], and there was a photo on the side of . . . where she was sitting, of [the defendant], she goes, 'yeah, that's GZ.' " Defense counsel then asked that Morrison's in-court identification be stricken on the ground of late disclosure by the state of Morrison's ability to identify the defendant in court. The court declined to strike Morrison's testimony.

A

On appeal, the defendant argues that Morrison's in-court identification of him was tainted by an unnecessarily suggestive identification procedure in the prosecutor's office prior to trial. He argues that the procedure was unnecessarily suggestive because the photographs on the prosecutor's desk were of the defendants, and that because Anthony Adams and Daquane Adams were well known to Morrison, "it would have been easy for her to determine that the photograph of the person she did not know was GZ. The nature and extent of [her] prior knowledge of GZ was questionable."[13] We are not persuaded.

In the context of eyewitness identifications, when a defendant claims "that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor . . . both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification. . . . In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Dickson*, supra, 322 Conn. 420–21.

On the basis of our plenary review, we conclude that the defendant cannot prevail on his claim that Morrison identified the defendant in the prosecutor's office as a result of an unnecessarily suggestive identification procedure. Morrison was not an eyewitness to the crime; instead, she identified the defendant from a photograph in the prosecutor's office, and then in court, as the person she knew as GZ. Although the only photographs in the prosecutor's office were those of the defendants, and although Morrison only saw the defendant "once in a blue moon," Morrison testified that at the time of the incident, she had known the defendant for, "[l]ike, a couple of years." The prosecutor did not ask Morrison to identify the individual in the defendant's photograph. Instead, she saw the photograph during her discussion with the prosecutor about the defendant, and told the prosecutor that it was a photograph of GZ. Morrison's identification of the defendant occurred spontaneously as a result of her familiarity with GZ, and not as the result of an arranged procedure by law enforcement. See *State* v. *Jones*, 59 Conn. App. 762, 766, 757 A.2d 689 (2000) ("[i]f an identification of a defendant is done spontaneously and is not arranged by the police, the identification is not tainted by state action and due process rights are not violated"), cert. denied, 255 Conn. 924, 767 A.2d 99 (2001). Because the pretrial identification occurrence was not unduly suggestive, Morrison's in-court identification of the defendant did not violate the defendant's due process rights, and the court did not err in allowing that identification to stand.

B

The defendant also argues that the court erred in declining to strike Morrison's identification testimony or to declare a mistrial because of the prosecutor's

violation of Practice Book § 40-13A,[14] by failing to disclose Morrison's identification of the defendant's photograph prior to trial. We are not persuaded.

Citing Practice Book § 40-5,[15] the defendant argues that if a party fails to comply with the rules of discovery, the court may preclude the evidence at issue. Section 40-5 "gives broad discretion to the trial judge to fashion an appropriate remedy for non-compliance with discovery. . . . Generally, [t]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Hamlett*, 105 Conn. App. 862, 873, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008). In the present case, the defendant has not demonstrated that the court abused its discretion by declining to strike Morrison's testimony or to declare a mistrial as a remedy for noncompliance with the discovery rules. First, the defendant has not demonstrated that the prosecutor violated Practice Book § 40-13A. As the state notes in its brief, the record does not indicate that the defendant made the written request required by § 40-13A. Additionally, Morrison's comment to the prosecutor, made prior to trial, identifying the defendant, was not a discoverable "statement" pursuant to § 40-13A. The term "statement," as used in that section, is defined as "(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." Practice Book § 40-15. Morrison's comment to the prosecutor was oral, and the record does not contain any evidence that it had been recorded.

Moreover, even if we assume that the prosecutor improperly withheld Morrison's statement from defense counsel, the court did not abuse its broad discretion in declining to impose sanctions under these circumstances. At trial, the prosecutor explained that he had not disclosed the identification because "it wasn't a situation where [Morrison] was identifying [the defendant] other than a situation that she had known [him] for a period of time. It wasn't implicating him in the crime or anything along those lines. It was more of a situation of, yeah, I know who he is because I've been

with him and I've been in his company for a number of years." Further, although "the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . In [its] review of the denial of a motion for mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial." (Citations omitted; internal quotation marks omitted.) *State v. Hamlett*, supra, 105 Conn. App. 872. Because the jury reasonably could have found that Morrison knew the defendant prior to the incident that resulted in the victim's murder, the defendant did not show that he was prejudiced by Morrison's identification of him. Under these circumstances, the court did not abuse its discretion by declining to strike Morrison's identification testimony or to declare a mistrial as sanctions against the state.

### III

The defendant next claims that the court erred in admitting certain hearsay testimony under the coconspirator exception to the hearsay rule.[16] Specifically, the defendant argues that the court improperly concluded that a conspiracy existed when determining whether to admit the testimony of Morrison, Daniels, Green, and Jamila Bello, an acquaintance of Anthony Adams, under the coconspirator exception to the hearsay rule. We disagree.[17]

"Statements made by coconspirators are recognized in Connecticut as an exception to the general prohibition against hearsay. See *State* v. *Vessichio*, 197 Conn. 644, 653–60, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986). However, [b]efore such statements may be admitted, the trial judge must make a preliminary determination that there is sufficient independent evidence to establish the following: (1) that a conspiracy existed . . . (2) that the conspiracy was still in existence at the time the statement was made . . . (3) that the declarations were made in furtherance of the conspiracy . . . and (4) that both the declarant and the defendant participated in the conspiracy . . . . The court must make its preliminary determination by a fair preponderance of the evidence independent of the hearsay utterances . . . a standard which is lower than the standard of evidence required to submit a charge of conspiracy to the jury. . . . Once the threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant . . . the conspirators' statements are admissible and they might tip the scale in favor of the defendant's guilt . . . ." (Inter-

nal quotation marks omitted.) *State* v. *Haggood*, 36 Conn. App. 753, 766–68, 653 A.2d 216, cert. denied, 233 Conn. 904, 657 A.2d 644 (1995).

The following facts and procedural history are necessary for the resolution of the defendant's claim. Morrison testified that Anthony Adams asked her to arrange a marijuana purchase and that he later informed her that Daquane Adams and the defendant would be making the purchase. The defendant did not object to this testimony. The defendant only later argued that the state had failed to satisfy the foundational requirements of *State* v. *Vessichio*, supra, 197 Conn. 653–60, for the admission of Morrison's statements under the coconspirator exception to the hearsay rule. According to the defendant, Morrison's statements could not be used as evidence of a conspiracy for purposes of establishing a foundation for Daniels' testimony because Morrison's statements were also inadmissible.

During the state's offer of proof outside the presence of the jury, Daniels testified that when Daquane Adams came to see her at work at approximately midnight on October 29, 2012, he informed her that her car had been stolen and that she should report her car as having been stolen, implying that he had been robbed. The defendant objected on the ground that there was insufficient independent evidence to establish the existence of a conspiracy. The defendant argued that the only potential evidence of a conspiracy was Morrison's testimony regarding what Anthony Adams had told her about the marijuana purchase, which, likewise, was improperly admitted under the coconspirator exception. The court sustained the objection to Daniels' testimony, reasoning that the state had not met its burden, at that time, of demonstrating that her statements were admissible under the coconspirator exception. Later in the trial, the state recalled Daniels to testify. The defendant again raised a *Vessichio* issue with respect to Daquane Adams' statements to Daniels. The court ruled that it would allow the statements into evidence but the state would "have to tie it in at some point and . . . it's subject to the tie-in." Daniels then testified in front of the jury that Daquane Adams had told her that he had been robbed and to report her car as stolen.

The defendant also objected to two portions of Green's testimony on the ground that a conspiracy had not been established pursuant to *Vessichio*. First, the defendant objected to Green's testimony that, while the victim and the individual with the bandana struggled over the gun, a third individual approached and said, "just give us the gun . . . ." The court overruled the objection, finding that the statement was admissible both under the coconspirator exception and to show the effect of the statement on Green. Second, the defendant objected to Green's testimony that the individual with the bandana said, "run it," which Green understood to

mean that this was a robbery. The court also overruled the second objection.

Later, Bello testified that after midnight on October 29, 2012, Anthony Adams telephoned her and asked her for a favor. The defendant objected on *Vessichio* grounds. The court overruled the objection, subject to the state "linking it in . . . ." Bello proceeded to testify that Anthony Adams had telephoned her and asked her to "pick [Daquane Adams] up and bring him to the hospital" because he "had to pick keys up from the hospital." She stated that when she arrived to pick up Daquane Adams, the defendant was also present, and he sat in the backseat while she drove Daquane Adams to the hospital. En route to the hospital, she heard the defendant exclaim, "[o]h, shit. Fuck." The defendant objected to this testimony, and the court overruled the objection. Bello testified that later that night, Anthony Adams telephoned her to thank her and said that "some wild shit happened," but that "we didn't go into details about what the wild shit [that] had happened was." After the state rested, the defendant renewed his objection to the hearsay statements by Morrison and Daniels regarding what Anthony Adams and Daquane Adams had said to them, respectively, and argued that the state had not proven the existence of a conspiracy sufficiently for the court to admit the coconspirator hearsay statements under the exception. The court stated that it had reserved judgment on Morrison's statements and that it had let other statements in under the coconspirator exception. The court then ruled that the statements were admissible under the coconspirator exception.

The defendant primarily challenges the sufficiency of the state's evidence admitted to establish by a fair preponderance that a conspiracy to commit robbery existed. The defendant further contends that even assuming a conspiracy existed, there was no evidence that the defendant was a participant in that conspiracy. We conclude that the court did not err in its preliminary determination that a conspiracy existed.

"The standard of proof of a fact by a fair preponderance has been met when all the evidence considered fairly and impartially evinces a reasonable belief that it is more probable than not that the fact is true. . . . In reviewing a claim that the state failed to meet the threshold of proof regarding the existence of a conspiracy with the defendant as a participant to permit evidence of out-of-court statements by coconspirators, we must construe the evidence in a way most favorable to sustaining the preliminary determinations of the trial court; its conclusions will not be disturbed on appeal unless found to be clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Haggood*, supra, 36 Conn. App. 767–68; see also *State* v. *Peeler*, 267 Conn. 611, 628, 841 A.2d 181 (2004).

The defendant argues that the court erred in condi-

tionally admitting into evidence hearsay testimony from Morrison and Daniels under the coconspirator exception, subject to the state satisfying the foundational requirements of *Vessichio* at a later point in the trial. He contends that the court was required to make a determination regarding the admissibility of the testimony under the coconspirator exception based only on the evidence elicited at trial prior, and not subsequent, to the admission of the testimony. We disagree, as *Vessichio* contains no such requirement. The court's conditional admission of the hearsay testimony subject to the state's later admission of the sufficient foundational evidence is permitted under § 1-3 (b) of the Connecticut Code of Evidence, which provides: "When the admissibility of evidence depends upon connecting facts, the court may admit the evidence upon proof of the connecting facts or subject to later proof of the connecting facts." In such an instance, "there can be no prejudice where . . . the necessary foundation is finally established." *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 725, 463 A.2d 533 (1983).

In the present case, the state later introduced the necessary connecting facts. During their investigation, the police found a black bandana containing the defendant's DNA in the victim's Acura. The center console of the Acura contained a bullet hole, and the interior frame on the driver's side door had a ricochet mark from a bullet. The police discovered Daniels' Toyota, which had been used in the robbery and which Daquane Adams had used to drive Daniels to work earlier that night, abandoned on a street near the West Haven parking lot in which the incident had occurred.

Bello testified that she picked up the defendant and Daquane Adams on the night of October 28, 2012, at a nearby location in West Haven. On November 1, 2012, the defendant met with his probation officer, and when his probation officer asked him to remove his sunglasses, he noticed that the defendant's eyes were "a deep red." Cell phone records showed calls between Anthony Adams and Daquane Adams during the time of the incident that utilized cell phone towers in West Haven. The cell phone records also showed calls that evening, at the times in question, between Anthony Adams and Morrison, between Anthony Adams and Daquane Adams, and between Anthony Adams and Bello.

The defendant also argues that the court erred in relying on coconspirator hearsay testimony in reaching its determination that the hearsay testimony that it had conditionally admitted into evidence was supported by the necessary foundational evidence of a conspiracy. He contends that the court improperly failed to rely exclusively on independent evidence. We disagree. There is no indication from the record that the court improperly considered the hearsay statements in its

analysis. The court mentioned coconspirator hearsay statements in addition to independent evidence when discussing whether the state had established the existence of a conspiracy by a preponderance of the evidence. Defense counsel, however, asked the court to clarify its basis, arguing that it could not "take [into account] the coconspirator hearsay declaration statements themselves." The court responded by specifying that it had relied on "the other independent evidence that was established." Defense counsel asked the court to clarify whether this independent evidence included Morrison's and Daniels' hearsay statements, and the court confirmed that it did not. It is clear from this colloquy that the court based its ruling only on independent evidence.

Because *Vessichio* does not require the court to determine the admissibility of the testimony under the coconspirator exception based only on the evidence elicited at trial prior, and not subsequent, to the admission of the statement, and because the court considered independent evidence that could establish by a preponderance of the evidence that a conspiracy to rob the victim existed and that the defendant was a participant in that conspiracy, the court's admission of the challenged statements was not improper.[18]

IV

The defendant next claims that the court erred in denying his motion to sever his trial from that of his codefendant, Anthony Adams. We disagree.

The following procedural history is relevant to this claim. Prior to the start of trial, the court, *Iannotti, J.*, granted the state's motion to consolidate the trials of the defendant and Anthony Adams. At a hearing on the motion, defense counsel stated that he was not objecting to consolidation. Prior to jury selection, the court, *Markle, J.*, questioned counsel regarding whether the joinder of the trials presented any issues under *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).[19] The court expressed concern that Anthony Adams' testimony could place the defendant at the scene of the crime. Anthony Adams' counsel stated that defense counsel "freely admits that his client was in the vicinity around the time of the shooting and is . . . claiming mere presence." Both counsel for the defendant and Anthony Adams stated that there were no *Bruton* issues, and that they did not object to the state's motion to consolidate.[20] The cases remained consolidated.

During Morrison's direct examination, and after she testified that she knew the defendant by his nickname, defense counsel moved for severance. Defense counsel argued that Morrison testified that Anthony Adams stated that "Day-Day and GZ" would purchase the marijuana, identifying "Day-Day" as Daquane Adams, and,

to counsel's surprise, "GZ" as the defendant. Defense counsel contended that he did not know that Morrison would identify the defendant as GZ, that her identification of GZ was a result of a suggestive pretrial procedure; see part II of this opinion; and that her testimony as to Daquane Adams arguably placed the defendant at the scene of the crime. The court denied the motion for severance.

Later, Danielle Zakar, an acquaintance of Anthony Adams, testified that on December 27, 2012, while Anthony Adams and another man were at her New York residence, the police arrived, causing the two men to flee. On direct examination, Zakar denied hearing Anthony Adams say why he was in New York. Joseph Thomas, a detective with the Fugitive Task Force Marshal Service, then testified, under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986),[21] that he took Zakar's statement, in which she indicated that she had overheard Anthony Adams state that he had killed a man in Connecticut and was now on the run from the Connecticut police.

On appeal, the defendant argues that severance was necessary because evidence was admitted at the joint trial that would not have been admissible against him at a separate trial. The evidence the defendant identifies as being inadmissible against him in a separate trial is as follows: hearsay statements Anthony Adams made to Morrison and Bello, which the defendant argues were inadmissible under the coconspirator exception to the hearsay rule; see part III of this opinion; and Zakar's statement to the police that she had heard Anthony Adams say that he was on the run because he had killed someone in Connecticut. Although the defendant argues that this issue is reviewable, he did not move for severance on the basis of this evidence and, as such, his claim is unpreserved. In the alternative, the defendant seeks review under the bypass rule of *State* v. *Golding*, supra, 213 Conn. 239–40, but he has not demonstrated that a constitutional violation exists and, therefore, has not satisfied the third prong of *Golding*.

The court clearly raised potential joint trial issues, specifying what types of evidence would create a *Bruton* issue.[22] Defense counsel reassured the court that such problems would not arise. As we concluded in part III of this opinion, Anthony Adams' statements to Morrison and Bello were admissible against the defendant under the coconspirator exception to the hearsay rule. Thus, the introduction of those statements did not create a *Bruton* issue. See *State* v. *Robertson*, 254 Conn. 739, 765, 760 A.2d 82 (2000). As to Zakar's *Whelan* statement, a *Bruton* issue "does not occur if the codefendant's confession is redacted to omit any reference to the defendant, and a proper limiting instruction is given by the trial court." *State* v. *Edwards*, 39 Conn. App.

242, 245, 665 A.2d 611, cert. denied, 235 Conn. 924, 925, 666 A.2d 1186 (1995). Zakar's *Whelan* statement did not identify the defendant, and the court gave curative instructions, reminding the jury that Thomas' testimony concerning his interview of Zakar was "directed toward the [codefendant] Anthony Adams." "Accordingly, the defendant did not suffer substantial prejudice by the admission of the codefendant's statement so as to require a separate trial." *State* v. *Edwards*, supra, 246. Because the defendant has not demonstrated that a constitutional violation exists, he cannot prevail under the third prong of *Golding*.[23]

V

The defendant next claims that the court erred in admitting into evidence (1) a photograph depicting a black bandana on the floor of the front passenger side of the Acura, and (2) a black bandana and the DNA evidence derived therefrom. We disagree.

The following additional procedural history is relevant. Murray testified that as part of the investigation, the police seized both the Acura and the Toyota, and that a black bandana was seized from the front passenger seat floor of the Acura. The prosecutor showed Murray a photograph and asked if it was an accurate representation of what the bandana looked like and where it was located before it was seized. Murray responded affirmatively. The prosecutor then sought to offer the photograph as an exhibit, and defense counsel objected. During voir dire, Murray stated that she did not remember who took the photograph or whether it was taken at the scene or at the West Haven Police Department. The court admitted the photograph as a full exhibit on the basis of Murray's testimony that it was a fair and accurate representation of what she observed at the West Haven Police Department.

Murray further testified on direct examination that she recognized the black bandana as being the one recovered from the Acura, that the bandana was taken into police custody, and that it remained in the possession of the West Haven Police Department prior to being sent to a laboratory for analysis. When the state sought to admit the bandana into evidence, defense counsel objected on the ground that Murray did not know the bandana's location prior to seeing it at the West Haven Police Department after the Acura had been towed to that location and, therefore, a chain of custody had not been established. The court overruled the objection, and the bandana was admitted as a full exhibit.

The defendant argues that the state failed to lay a proper foundation for the admission of the photograph, the bandana, and the DNA evidence. With respect to the photograph of the bandana, the defendant contends that the state failed to establish its authenticity because

Murray could not identify who took it or where it had been taken. Regarding the bandana itself and the DNA evidence derived from the bandana, the defendant argues that the state failed to establish a sufficient chain of custody because the state "could not demonstrate that the bandana was originally in the Acura at the scene, and had not been moved or tampered with in any respect before it was seized at the police department." In making this argument, the defendant contends that Green had not seen the shooter without the bandana, the first officer to arrive at the scene did not see the bandana in the Acura after conducting a plain view search of the vehicle, and an inventory listed the black bandana as having been seized from the Toyota rather than from the Acura. The defendant argues that the only evidence linking the bandana to the Acura was Murray's testimony, which related to the bandana's location at the police department, not at the scene.

We first address the defendant's claim with respect to the photograph and conclude that the court did not abuse its discretion in admitting the photograph into evidence. "Under [the foundational] standard [for photographs], all that is required is that a photograph be introduced through a witness competent to verify it as a fair and accurate representation of what it depicts." *State* v. *Swinton*, 268 Conn. 781, 802, 847 A.2d 921 (2004). "[T]he testimony of the photographer is not essential for the authentication of a photograph, as long as other evidence is produced that satisfies the court." *Gioielli* v. *Mallard Cove Condominium Assn.*, *Inc.*, 37 Conn. App. 822, 834, 658 A.2d 134 (1995). "Verification of a photograph is a preliminary question of fact to be determined by the trial court. . . . Whether a photograph shows a situation with sufficient accuracy to render it admissible, is a preliminary question for the court . . . . [T]he trial court has wide discretion in admitting photographic evidence and its determination will stand unless there has been a clear abuse of that discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Walker*, 215 Conn. 1, 6, 574 A.2d 188 (1990). Although the photographer did not testify, Murray's testimony that the photograph was a fair and accurate representation of what the bandana looked like before it was seized satisfied the court as to the photograph's authenticity. See *State* v. *Swinton*, supra, 802; *Gioielli* v. *Mallard Cove Condominium Assn.*, *Inc.*, supra, 834. Regardless of whether Murray remembered who took the photograph or knew whether the photograph was taken at the scene or at the police department, the court did not clearly abuse its discretion in finding that Murray was a competent witness to testify that the photograph was a fair and accurate representation of what she personally observed in the car. See *State* v. *Walker*, supra, 6. Thus, Murray's testimony provided a proper foundation for the admission of the photograph.

We next address the defendant's argument regarding the admissibility of the bandana, and the DNA evidence derived therefrom. "Appellate courts grant great deference to a trial court's ruling on the admissibility of evidence . . . and will not disturb such rulings absent a clear abuse of the trial court's discretion. . . . As a general rule, it may be said that the prosecution is not required or compelled to prove each and every circumstance in the chain of custody beyond a reasonable doubt . . . . It is not necessary for every person who handled the item to testify in order to establish the chain of custody. It is sufficient if the chain of custody is established with reasonable certainty to eliminate the likelihood of mistake or alteration." (Internal quotation marks omitted.) *State* v. *Lowe*, 61 Conn. App. 291, 303, 763 A.2d 680 (2001).

"The state's burden with respect to chain of custody is met by a showing that there is a reasonable probability that the substance has not been changed in important respects. . . . The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . . Thus, this court has found sufficient evidence to establish an adequate chain of custody where there is testimony that evidence was transferred between law enforcement personnel, delivered and received by the state toxicology laboratory and was identified at trial as the same evidence in an unchanged condition with no indication of tampering." (Citation omitted; internal quotation marks omitted.) Id. "An object connected with the commission of a crime must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted into evidence. . . . There is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article or substance has been tampered with; in each case the trial court must satisfy itself in reasonable probability that the substance had not been changed in important respects." (Internal quotation marks omitted.) *State* v. *Pollitt*, 205 Conn. 61, 88, 530 A.2d 155 (1987).

The court reasonably could have concluded that the bandana had not been tampered with. Following the incident, Green, who was driving the Acura, followed the Toyota. The Acura became disabled after hitting the Toyota in the vicinity of Glade Street and Terrance Street in West Haven. Seth Twohill, an officer with the West Haven Police Department, arrived on the scene at approximately midnight, and saw the Acura at that location and Green attempting to revive the victim. Twohill blocked off the area with crime scene tape. Joseph D'Amato, another responding officer, testified that Green and the victim were in the Acura when he arrived, and that he did not see anyone disturbing the integrity of the crime scene. Murray testified that the

Acura was later towed from its location in West Haven to the West Haven Police Department. Robert Fazzino, a detective with the West Haven Police Department, and Murray testified that the black bandana was removed from the Acura. Murray further testified that the black bandana was in police custody prior to being sent to the laboratory. At trial, Murray recognized her initials on the packaging containing the bandana. Degnan testified that she received the bandana from the West Haven Police Department, designated the front and back side of the bandana with numbers, placed her initials on the barcode and sealed it with evidence tape that also had her initials on it.

The defendant's argument that the bandana could have been tampered with between the time of the commission of the crime and the time the bandana was recovered by police is pure speculation. *State* v. *Estrada*, 71 Conn. App. 344, 354, 802 A.2d 873 (mere speculation of tampering insufficient to show break in chain of custody), cert. denied, 261 Conn. 934, 806 A.2d 1068 (2002). There is no evidence to support the defendant's claim that the bandana could have been tampered with between the time Green followed the Toyota, hit the Toyota, and tried to revive the victim, and when the Acura was towed to the West Haven Police Department. The defendant incorrectly suggests that an absence of evidence of tampering weighs in his favor. In the absence of "an affirmative showing that the evidence was in some way tampered with, misplaced, mislabeled or otherwise mishandled"; (internal quotation marks omitted) *State* v. *Lowe*, supra, 61 Conn. App. 304; we cannot conclude that the court abused its discretion in admitting the bandana into evidence. See *State* v. *Johnson*, 162 Conn. 215, 233, 292 A.2d 903 (1972) (where there was no affirmative showing that evidence was tampered with, it cannot be said that court abused discretion in admitting evidence).[24] Because there was a sufficient chain of custody for the admission of the bandana and, by extension, the DNA evidence derived from the bandana, we conclude that the court did not abuse its discretion in admitting these two items into evidence.

VI

The defendant last claims that his conviction of both felony murder and manslaughter in the first degree with a firearm, which arose from the act of killing the victim, violates his right against double jeopardy and, accordingly, his manslaughter conviction should be vacated. The state agrees that the manslaughter conviction should be vacated.

The defendant seeks review of his unpreserved double jeopardy claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We review this claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Barber*, 64 Conn. App.

659, 671, 781 A.2d 464 ("[i]f double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable" [internal quotation marks omitted]), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001).

"The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. . . . Double jeopardy prohibits . . . multiple punishments for the same offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Carlos P.*, 171 Conn. App. 530, 537, 157 A.3d 723, cert. denied, 325 Conn. 912, 158 A.3d 321 (2017). In *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013), our Supreme Court held that if a defendant is convicted of greater and lesser included offenses, the trial court must vacate the conviction of the lesser offense. Our Supreme Court in *State* v. *Miranda*, 317 Conn. 741, 751, 120 A.3d 490 (2015), extended the rule of vacatur in *Polanco* for double jeopardy claims to apply in a situation such as this, where there are multiple homicide convictions that are based on a single act. In the present case, the defendant's conviction of felony murder and manslaughter violate his constitutional protections against double jeopardy. Accordingly, the third prong of *Golding* is met, and the defendant prevails on his claim. See *State* v. *Biggs*, 176 Conn. App. 687, 714, 171 A.3d 457, cert. denied, 327 Conn. 975, 174 A.3d 193 (2017).

The judgment is reversed only as to the defendant's conviction of manslaughter in the first degree and the case is remanded with direction to vacate that conviction and to resentence the defendant consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The Toyota was discovered to belong to Ronja Daniels, Daquane Adams' girlfriend. Daniels testified that earlier that night, Daquane Adams had dropped her off at work and borrowed her car.

[2] Anthony Adams was charged with felony murder in violation of § 53a-54c; manslaughter in the first degree with a firearm in violation of § 53a-55a (a); attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2), 53a-134 (a) (2); and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a). Daquane Adams was also a codefendant but was tried separately.

[3] The defendant mentions in his brief that the court also violated his right under article first, § 8, of the Connecticut constitution; however, he fails to provide an independent analysis of his state constitutional claim. We, accordingly, deem his state constitutional claim abandoned. See *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474 ("[w]ithout a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim" [internal quotation marks omitted]), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

[4] According to Degnan's findings, the expected statistical frequency that an individual could be a contributor to the DNA profile found on the bandana was less than one in seven billion in a random population.

[5] Degnan testified that she did not enter the profile of the minor contributor into the databases because it did not meet the guidelines to qualify for entry.

[6] Anthony Adams and Daquane Adams were eliminated as contributors to the DNA extracted from the bandana.

[7] Neither counsel raised a *Crawford* v. *Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), or a confrontation issue.

[8] On appeal, the defendant does not argue that admitting Degnan's report violated his right to confrontation.

[9] Because confrontation claims that involve testimonial hearsay raise due process concerns, and because those claims are not determined on the basis of the rules of evidence after *Crawford* v. *Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), it is particularly important that trial counsel articulate whether they are raising a constitutional due process claim or an evidentiary issue. See, e.g., *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017) ("to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party" [internal quotation marks omitted]); *State* v. *Hilton*, 45 Conn. App. 207, 222, 694 A.2d 830 ("[w]e are not bound to consider claims of law not properly raised at trial"), cert. denied, 243 Conn. 925, 701 A.2d 659 (1997), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998).

[10] There is no evidence in the record to suggest that the analyst was not available to be called to testify by either the state or the defendant.

[11] Similarly, under the Connecticut Code of Evidence, "[t]he facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. . . ." Conn. Code Evid. § 7-4 (b).

[12] Although the defendant raises this claim under the Connecticut constitution, he does not provide a separate analysis of the claim under the Connecticut constitution and, accordingly, we deem that claim abandoned. See footnote 3 of this opinion.

[13] On appeal, unlike at trial, the defendant does not argue that Morrison's in-court identification of him was the product of an inherently suggestive procedure due to the courtroom setting but, instead, focuses on the out-of-court identification procedure's effect on the in-court identification.

[14] Practice Book § 40-13A provides that "[u]pon written request by a defendant and without requiring any order of the judicial authority, the prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged . . . ."

[15] Practice Book § 40-5 provides in relevant part that "[i]f a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order" and sets forth a nonexhaustive list of sanctions to be imposed "as it deems appropriate . . . ."

[16] The defendant also argues that the admission of this evidence violated his right to confrontation under the federal and state constitutions. We conclude that the court properly admitted the statements because coconspirator statements, "by their nature [are] not testimonial." *Crawford* v. *Washington*, supra, 541 U.S. 56. As *Crawford* acknowledged, "generally speaking, the admission of out-of-court statements for purposes other than their truth, such as statements in furtherance of a conspiracy, do not raise confrontation clause issues." *State* v. *Azevedo*, 178 Conn. App. 671, 679,    A.3d    (2017), cert. denied, 328 Conn. 908,    A.3d    (2018).

[17] Insofar as the defendant argues that the court erroneously found that these statements were reliable, we hold that the court did not abuse its discretion in deciding to admit these statements. See, e.g., *State* v. *Camacho*, 282 Conn. 328, 363, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

[18] Furthermore, as the state suggests in its brief, Green's testimony that he heard the man with the bandana say, "just give us the gun," and, "run it," as well as Bello's testimony that she heard the defendant exclaim, "[o]h, shit. Fuck," as she drove him to the hospital were also admissible as to the defendant as statements by a party opponent. Conn. Code Evid. § 8-3 (1). Section 8-3 of the Connecticut Code of Evidence provides in relevant part

that "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness (1) . . . [a] statement that is being offered against a party and is . . . the party's own statement, in either an individual or a representative capacity . . . ."

These statements were offered against the defendant and were the defendant's own statements. The statements were both relevant and material, providing inculpatory evidence against the defendant, and thus, were admissible under this exception to the hearsay rule, in addition to the coconspirator exception. See *State* v. *Ferguson*, 260 Conn. 339, 357–58, 796 A.2d 1118 (2002) ("[s]tatements made out of court by a party-opponent are universally deemed admissible when offered against him . . . so long as they are relevant and material to issues in the case" [citation omitted; internal quotation marks omitted]).

[19] "[I]n *Bruton*, the United States Supreme Court held that a defendant is deprived of his rights under the confrontation clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. . . . In *Bruton*, however, the court emphasized that it was dealing with a case in which the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence. . . . Several lower courts have thus concluded that *Bruton* has no application when the statements of a codefendant are otherwise admissible against the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 765, 760 A.2d 82 (2000).

[20] At oral argument before this court, the state maintained that there was no *Bruton* violation or evidence that triggered *Bruton*.

[21] *State* v. *Whelan*, supra, 200 Conn. 753, established a hearsay exception that allows "the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination."

[22] The court explained that "the legal issues that are addressed under the *Bruton* issue that would prohibit joinder [are] whether or not there are any postarrest statements made by codefendants and/or confessions that can be used to prejudice another codefendant. And if those statements or confessions are entered into during the course of the evidence, *Bruton* says clearly that there is a conflict and the codefendant can't be prejudiced by that, and therefore you can't join the cases together; you have to have separate trials."

[23] The reason stated by the defendant for moving for severance was Morrison's identification of the defendant as "GZ." This identification was based on Morrison's prior knowledge of the defendant and would have been admissible against the defendant in a separate trial. See part II of this opinion; see also *State* v. *Johnson*, 29 Conn. App. 394, 396, 615 A.2d 512 (1992) (defendant withdrew motion to suppress upon learning that witness' identification of him was based, "in part, on her prior knowledge of and contact with him"), appeal dismissed, 227 Conn. 611, 630 A.2d 69 (1993).

[24] Evidence that an inventory listed the bandana as having been recovered from the Toyota, instead of the Acura, does not render the bandana inadmissible. Fazzino testified that, as the lead investigator, he signed an inventory mistakenly indicating that the black bandana had been recovered from the Toyota. He testified that he personally saw the black bandana in the Acura and that it was recovered from the Acura, not the Toyota. That an inventory sheet listed the bandana as having been seized from the Toyota goes to the weight of the evidence, not its admissibility. See, e.g., *State* v. *John*, 210 Conn. 652, 678, 557 A.2d 93 ("fact that there was conflicting evidence regarding the [fact] in question would go to the weight of [witness'] opinion and not to its admissibility"), cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).