******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JAVIER
VALENTIN PORFIL
(AC 40305)

Prescott, Elgo and Harper, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of possession of narcotics with
intent to sell by a person who is not drug-dependent, sale of narcotics
within 1500 feet of a school, possession of drug paraphernalia, posses-
sion of narcotics and interfering with an officer, the defendant appealed
to this court, claiming, inter alia, that the evidence was insufficient to
support his conviction and that the trial court deprived him of his
constitutional right to present a defense by improperly excluding certain
photographic evidence. The police had received an anonymous tele-
phone call, stating that the defendant, whom the caller identified by
first and last name, had warrants and was selling narcotics from the
open front porch of a three-story multifamily house. After verifying
that the defendant had active warrants, a police officer, P, obtained a
photograph of the defendant and drove to the subject house, where he
observed the defendant sitting alone on the porch wearing shorts, a
blue tank top and a baseball hat. P then positioned himself across the
street from the house, where he had a clear view of the porch through
his binoculars and was able to see that the left front door was open,
revealing a little part of a staircase leading to the second floor landing.
After watching the defendant for a while, P observed a man approach
the house and engage in a brief conversation with the defendant at the
bottom of the porch stairs. P then observed the defendant walk through
the open doorway, reemerge after a time, descend the porch stairs and
engage in an item-for-item exchange with the man, who then left. A few
minutes later, P saw a car park at an intersection near the house and
observed a man exit the car, approach the house and engage in a brief
conversation with the defendant, who again walked into the house
through the open doorway, reappeared a few seconds later and engaged
in another item-for-item exchange. The man then walked back to his
car and drove away. No one else was seen with the defendant throughout
this transaction other than the person with whom he had made the
exchange. During this time, P was in constant radio communication with
other officers positioned nearby, who, upon receiving P's notification,
approached the front and the rear of the house. T and two other officers
found the defendant alone on the porch, dressed in a blue tank top,
shorts and a baseball cap, with the left front door to the house open.
Upon seeing the officers, the defendant turned around and ran through
the open doorway up the staircase and entered the second floor apart-
ment. As the officers pursued the defendant, they observed that there
was no one else in the stairwell. Meanwhile, S and another officer had
positioned themselves on the back porch near the exterior rear door.
After a short time, S observed the defendant begin to exit through the
door, but, upon seeing the officers, he retreated back into the house
and shut the door. The police subsequently searched the entire house,
but the defendant could not be located. In searching the house, however,
they found a brown paper bag in plain view in the second floor hallway,
which contained a digital scale, rubber bands, and 171 bags of heroin,
packaged in bundles of ten glassine packets, tied with rubber bands,
and packed in rice. The total street value of the heroin was between
approximately $1000 and $1150. P subsequently arrested the defen-
dant. *Held*:

1. The defendant could not prevail on his claim that the evidence was
insufficient to support his conviction, which was based on his claim
that the state failed to produce sufficient evidence to prove beyond a
reasonable doubt that he had constructive possession of the narcotics
recovered by the police from the common area of the subject house:
the defendant's reliance on *State* v. *Nova* (161 Conn. App. 708) for his
contention that the state failed to establish, in addition to his spatial and
temporal proximity to the narcotics, the existence of other incriminating

statements or circumstances linking him to them was misplaced, as unlike in *Nova*, there was evidence in the present case of hand-to-hand exchanges in a high crime area with substantial narcotic activity, which transformed the defendant's prior presence on the porch and movement toward the second floor hallway into something more than mere proximity to the narcotics seized from that hallway, the state did not did not rely solely on the hand-to-hand exchanges and the defendant's proximity to the narcotics, as the street value of the heroin recovered, the particular location in which it was found and the absence of other individuals observed in that location provided additional support for an inference that the defendant had been selling the narcotics from the porch of the house, and provided a basis for the jury reasonably to conclude that the most likely explanation for why the narcotics were found in plain view in a common area of the house was that whoever claimed ownership or possession of them had placed them there intentionally and actively was engaged in selling them; moreover, given the tip from the anonymous caller and the testimony of P and T that the defendant had been alone on the porch throughout the transactions and that no one else had been seen in the stairwell, the jury reasonably could have concluded further that it was the defendant who had been actively engaged in selling the narcotics, and, on the basis of the defendant's flight, the jury reasonably could have inferred that he possessed a guilty conscience with respect to both the conduct underlying his outstanding arrest warrants against him and the conduct underlying the present case; accordingly, considering all of this evidence together with the defendant's temporal and physical proximity to the narcotics recovered by the police, the jury reasonably could have inferred that the defendant had been selling the subject narcotics from the porch of the house during the time in question and, by necessary implication, concluded that he was aware of the nature and presence of the narcotics and had dominion and control over them.

2. The defendant's claim that the trial court committed evidentiary error and deprived him of his constitutional right to present a defense by improperly excluding certain photographs of the front and back of the house was unavailing:

a. The trial court's exclusion of the photograph of the front of the house, which depicts what appear to be two trees with lush foliage completely obstructing the view of the porch from where P had observed the defendant engaging in the two hand-to-hand exchanges, did not deprive the defendant of his constitutional right to present a defense: even if this court assumed that the exclusion of the photograph was improper, the defendant was able to adequately present his defenses of misidentification and lack of possession by other means and had additional, alternative avenues available to him to further bolster his defenses, and, therefore, the exclusion of the photograph did not rise to the level of a constitutional violation; moreover, this court had a fair assurance that any impropriety in excluding the defendant's photograph of the front of the house did not substantially affect the jury's verdict because, even without P's testimony regarding the hand-to-hand exchanges, there was compelling substantial evidence tending to prove the defendant's identity as the suspect and of his constructive possession of the narcotics, and, contrary to the defendant's contention that the excluded photograph likely would have significantly undermined P's testimony that he had a clear view of the porch, there was strong evidence corroborating P's testimony.

b. The trial court properly excluded the photograph of the rear of the house, that court having correctly determined that the defendant failed to authenticate the photograph; at trial, defense counsel represented to the court that the defendant was prepared to testify that the front of the house, as depicted in his photograph, looked substantially similar to the way it looked at the time the offenses were committed, but he made no similar offer of proof with respect to the photograph of the back of the house, and, therefore, the defendant failed to make the prima facie showing required to authenticate the photograph of the back of the house.

3. The defendant could not prevail on his claim that the trial court improperly prevented him from showing a scar on his back to the jury, thereby depriving him of this constitutional right to present his defense that he was misidentified as the suspect seen running from the police at the house, as that court did not abuse its discretion by excluding the demon-

stration of the scar as needlessly cumulative; although the defendant's medical records, which were admitted into evidence by agreement of the parties, did not disclose the condition of the defendant's back at the time of the offenses, the jury reasonably could have inferred from the records that a spinal surgery undergone by the defendant had left a scar on his back, and the jury did not need to rely solely on inferences, as the defendant explicitly testified that, as a result of the spinal surgery, he had a scar on his back, and the state did not contest that aspect of the defendant's testimony.

Argued January 9—officially released July 30, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of possession of narcotics with intent to sell by a person who is not drug-dependent, sale of narcotics within 1500 feet of a school, possession of drug paraphernalia, possession of narcotics and interfering with an officer, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Harmon, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, with whom, on the brief, was, *Samantha L. Oden*, former certified legal intern, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *David A. Gulick*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Javier Valentin Porfil, appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b), possession of drug paraphernalia in violation of General Statutes § 21a-267, and possession of narcotics in violation of General Statutes § 21a-279 (a).[1] The defendant claims on appeal that (1) the evidence was insufficient to establish that he was in constructive possession of narcotics,[2] (2) the trial court deprived him of his constitutional right to present a defense by improperly excluding certain photographic evidence and (3) the trial court deprived him of his constitutional right to present a misidentification defense by preventing him from displaying a scar to the jury. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 14, 2015, the Waterbury Police Department received an anonymous telephone call, stating that the defendant, whom the caller identified by first and last name, "had warrants" and was selling narcotics from the porch of 126–128 Walnut Street in Waterbury. Located at this address is a three-story multifamily house with an open front porch. The house has two front doors; the door on the left opens to a staircase leading to the second floor landing, and the door on the right opens to a first floor apartment. The house also has a back door that leads to the back door of the first floor apartment and a back staircase to the second floor. The defendant did not live at this address, but he was there often to visit family members. After verifying that the defendant did indeed have active warrants, Officer Scott Phelan obtained a photograph of the defendant and headed to the house in an undercover vehicle. Meanwhile, several other uniformed officers waited in unmarked vehicles in the vicinity of the house, ready to "move in" on the defendant on Phelan's word.

Phelan proceeded to drive past the house where he observed the defendant sitting alone on the porch wearing shorts, a blue tank top, and a baseball hat. Phelan then sought out a location from which he could best observe the defendant. He eventually took up a position across the street in the area of the intersection of Walnut Street and Cossett Street, approximately 150 or 175 feet southwest of the porch. From this position, Phelan had a clear view of the porch through his binoculars and was able to observe that the left front door was open, revealing a "little bit" of the staircase. He did not observe anyone in the stairway. After watching the defendant for a time, Phelan observed a man approach the house and engage in a brief conversation with the

defendant at the bottom of the porch stairs. The defendant then walked through the open doorway, reappeared after a time, descended the porch stairs, and "exchange[d] . . . an item for an item" with the man. The man then left.

A few minutes later, Phelan saw a vehicle pull up and park on the corner of Catherine Avenue and Walnut Street and observed a man exit the vehicle, approach the house, and engage in a brief conversation with the defendant.[3] The defendant again walked into the house through the open doorway, reappeared a few seconds later, and engaged in another item-for-item exchange. The man then walked back to his car and drove away. No one else was seen with the defendant throughout this transaction other than the person with whom he had made the exchange.

During this time, Phelan was in constant radio communication with the other officers positioned nearby and relayed to them that he had observed the defendant engage in two hand-to-hand exchanges. Meanwhile, the other officers waited to receive notification from Phelan that the defendant had stepped far enough away from the house to give the officers a good chance of apprehending him in case he tried to run back inside. After receiving such notification, Officer Jerome Touponse and two other officers ran to the front porch, and two officers went to the back of the house to secure the rear door.

Upon approaching the front of the house, Touponse and the other officers found the defendant alone on the porch, dressed in a blue tank top, shorts, and a baseball cap, with the left front door to the house open. The defendant then turned around and ran through the open left front doorway up the staircase and entered the second floor apartment.[4] The officers gave chase. There was no one else in the stairwell as they pursued the defendant. The officers eventually made their way inside the second floor apartment, where the occupants pointed the police to the back door of the apartment. Touponse went to the back door, but the defendant was nowhere to be seen.

Meanwhile, the two officers tasked with covering the back of the house, Rose[5] and David Shaban, positioned themselves on the back porch near the exterior rear door; Shaban stood directly in front of the door, with Rose a few steps behind him. After a short time, Shaban observed the defendant, who was wearing a blue shirt and a baseball cap, begin to exit through the door, but, upon seeing the officers, he retreated back into the house and shut the door. When the officers were eventually able to get through the door, they found the back door to the first floor apartment was open. The front door to the apartment was also open, which indicated to Shaban that the defendant had run right through the apartment.

The police subsequently searched the entire house, but the defendant could not be located. In searching the house, however, they found a brown paper bag in plain view in the hallway extending to the right of the entrance to the second floor apartment. See footnote 4 of this opinion. The bag contained a digital scale, rubber bands, and 171 bags of heroin, packaged in bundles of ten glassine packets, tied with rubber bands, and packed in rice. The total street value of the heroin was between approximately $1000 and $1150.

Officer Phelan arrested the defendant several months later, in February, 2016. After Phelan explained to him that he was being arrested in connection with the events of August 14, 2015, the defendant stated that he was "sorry for running." The defendant subsequently was charged with, inter alia, possession of narcotics with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b), sale of narcotics within 1500 feet of a school in violation of § 21a-278a (b), possession of drug paraphernalia in violation of § 21a-267, and possession of narcotics in violation of § 21a-279 (a). A jury trial was held beginning on October 11, 2016, at which the defendant testified in his own defense.[6] On October 13, 2016, the jury returned a verdict of guilty on all counts, and the defendant was sentenced on January 20, 2017.[7] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the evidence adduced at trial was insufficient to support his conviction because the state did not produce sufficient evidence to prove beyond a reasonable doubt that he had constructive possession of the narcotics recovered by the police from 126–128 Walnut Street. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves

the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Griffin*, 184 Conn. App. 595, 613–14, 195 A.3d 723, cert. denied, 330 Conn. 941, 195 A.3d 692 (2018) and cert. denied, 330 Conn. 941, 195 A.3d 693 (2018).

"[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where . . . the [narcotics were] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime. . . . [T]he test for illegal possession of drugs is that the accused must know that the substance in question is a drug, must

know of its presence and exercise dominion and control over it. . . .

"Importantly, [k]nowledge of the presence of narcotics and control may be proved circumstantially. . . . Knowledge that drugs are present and under a defendant's control when found in a defendant's home or car is more easily shown, of course, if the defendant has exclusive possession of the area in which the drugs are found. The difficult cases . . . arise when possession of an area, such as a car or home or an apartment, is shared with another person or persons. In situations in which the putative offender is not in exclusive possession of the premises where the narcotics are found, we may not infer that he or she knew of the presence of the narcotics or that he or she had control over them, without incriminating statements or circumstances to support that inference." (Internal quotation marks omitted.) *State* v. *Bischoff*, 182 Conn. App. 563, 571–72, 190 A.3d 137, cert. denied, 330 Conn. 912, 193 A.3d 48 (2018).

In the present case, there is no dispute that narcotics were found in the second floor hallway of 126–128 Walnut Street, and the defendant concedes in his appellate brief that the quantity of narcotics recovered permits an inference that they were intended for sale.[8] There is also no dispute—at least for purposes of the defendant's evidentiary insufficiency claim—that, shortly before the discovery of the narcotics by the police, the defendant repeatedly entered 126–128 Walnut Street through the doorway leading to the second floor hallway. As previously stated, however, spatial and temporal proximity to contraband, without more, is insufficient to establish constructive possession if, as in the present case, the contraband is found in a common area over which the defendant did not have exclusive possession. The state, therefore, was required to establish the existence of other incriminating statements or circumstances linking him to the narcotics. According to the defendant, the state failed to introduce evidence of any such statements or circumstances, and, therefore, his conviction must be reversed. In support of this claim, the defendant relies primarily on this court's decision in *State* v. *Nova*, 161 Conn. App. 708, 129 A.3d 146 (2015). This reliance is misplaced.

In *Nova*, the defendant had been the subject of an ongoing police investigation, and the police had obtained a warrant to search the defendant and an apartment to which he was linked for narcotics. Id., 710. In preparation for execution of the warrant, police officers conducted surveillance of the building. Id. During the surveillance, the defendant was observed entering the apartment through the main entry door, which opened into the kitchen. Id., 711. He reemerged a few moments later and ascended an external staircase to a balcony on the third floor of the building that adjoined the upper level of the apartment, where he remained

for approximately one minute. Id. The defendant then returned to his car in the apartment building's parking lot. Id.

"Shortly after the defendant returned to his car, police observed a brief meeting between the defendant and another individual in the building's parking lot. Specifically, the officers saw a white male drive a pickup truck into the parking lot and park next to the defendant's car. The defendant opened the pickup truck's passenger side door, leaned in, and spoke to the driver for approximately one minute. During the meeting, police did not observe any hand-to-hand contact or the exchange of any item. Afterward, the pickup truck left the parking lot." Id. Moments later, a police officer observed the driver of the pickup truck appear to snort something and wipe his nose while stopped at a red traffic signal. Id. The officer, however, did not see any drugs or hear the driver snorting, and the police did not attempt to stop the truck. Id.

The defendant was then detained and arrested; he did not resist or make any incriminating statements, and no cash or drugs were found on his person or in his car. Id., 711–12, 713. "The search of the apartment revealed drugs and drug paraphernalia throughout. In the kitchen, a knotted plastic bag containing crack cocaine and a plastic bag containing powder cocaine were in a kitchen cabinet; and clear plastic bags, aluminum foil, and colored tape containing cocaine residue were in a garbage can. On the third floor balcony . . . officers found a clear plastic sandwich bag containing twelve small yellow ziplock bags in a Wal-Mart shopping bag." Id., 712.

Following a trial to the court, the defendant was convicted of possession of narcotics and possession of narcotics within 1500 feet of a school. Id., 710. "In reaching its judgment, the court relied on several factors that it deemed sufficiently incriminating to support an inference of constructive possession: the defendant's status as the target of the police investigation; his presence in the areas of the apartment where drugs and paraphernalia were found—namely, the kitchen and the balcony; his meeting with the driver of the pickup truck; and his unfettered access to the apartment . . . ." Id., 720. On appeal to this court, the defendant claimed that this evidence was insufficient to sustain his conviction because the state had failed to prove beyond a reasonable doubt that he constructively possessed the drugs found in the common areas of the apartment. Id., 716. This court agreed, holding that none of these factors, alone or in combination with the others, established anything more than a temporal and spatial nexus between the defendant and the cocaine. Id., 720, 725.

With regard to the defendant's presence in the kitchen and balcony, the court concluded that this "evidence established merely that he briefly appeared in those

areas." Id., 721. More specifically, the court stated that, given the absence of "evidence show[ing] the [defendant] making suspicious movements toward the narcotics, or carrying a bag similar to one later found to contain narcotics, *or engaging in a drug sale near the narcotics*," the state had failed to show "a compelling correlation between the defendant's actions . . . and the conclusion that he controlled the narcotics in the apartment." (Emphasis added.) Id., 722. As to the evidence regarding the defendant's meeting with the driver of the pickup truck and the driver's apparent snorting of some substance thereafter, the court concluded that such evidence fell short of supporting an inference that the defendant had controlled the cocaine in the apartment. Id., 723. In so concluding, the court stressed that, "[w]ithout *evidence of any item changing hands* or of the substance the driver was supposedly consuming, his suspicious movements did not transform the defendant's prior presence on the balcony and in the kitchen into something more than mere proximity to the contraband seized from those places." (Emphasis added.) Id., 724. Accordingly, this court reversed the defendant's conviction. Id., 725.

Contrary to the defendant's contention, *Nova* is materially distinguishable from the present case. Most significantly, the defendant in the present case was observed by Officer Phelan engaging in two hand-to-hand transactions. In each instance, the defendant was approached by an individual from the street. After a brief conversation with the individual, the defendant entered the house through the open left front door, reemerged moments later, and proceeded to exchange "an item for an item" with the individual, who then promptly left. In Phelan's experience, this behavior was indicative of hand-to-hand drug transactions.

Officer Gary Angon, an expert on heroin sales, likewise testified that the defendant's behavior on the porch was consistent with heroin dealing. Angon testified that sellers generally keep the heroin they sell in a location near the point of sale but not on their person, so as to avoid detection by the police. According to Angon, "[u]sually they like to keep it within sight so they can tell if anyone is going to try and take their product," "usually in a spot that's within a few seconds so they can be able to make their interaction with a customer, find out what it is they need to get and go to that spot, retrieve it and come back." Phelan's and Angon's opinions at trial were supported further by testimony that 126–128 Walnut Street is situated in a high crime area with substantial narcotics activity. See *State* v. *Slaughter*, 151 Conn. App. 340, 349, 95 A.3d 1160 (detectives' conclusions that defendant's conduct was consistent with that of drug sellers were supported by testimony that neighborhood in which purported sales occurred was known to be high crime area in which drug sales took place), cert. denied, 314 Conn. 916, 100

A.3d 405 (2014); see also *State* v. *Barber*, 64 Conn. App. 659, 667, 781 A.2d 464 ("[e]vidence demonstrating that the defendant was present in a known drug trafficking area further suggests an intent to sell" [internal quotation marks omitted]), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001). Consequently, unlike in *Nova*, there was evidence in the present case of items changing hands, thus transforming the defendant's prior presence on the porch and movement toward the second floor hallway into something more than mere proximity to the contraband seized from that hallway. See *State* v. *Nova*, supra, 161 Conn. App. 724.

The defendant further argues, however, that the evidence of the hand-to-hand exchanges fails to show a compelling correlation between his actions and the conclusion that he controlled the narcotics found in the hallway because there was no evidence that the items exchanged were either money or contraband. According to the defendant, "[i]n those cases in which observed, alleged drug sales have formed a basis for sustaining a defendant's conviction, additional circumstantial evidence establishing a direct connection has been introduced. Usually this involves a view of either the object or of the currency." Specifically, the defendant points to this court's decisions in *State* v. *Slaughter*, supra, 151 Conn. App. 340, and *State* v. *Forde*, 52 Conn. App. 159, 726 A.2d 132, cert. denied, 248 Conn. 918, 734 A.2d 567 (1999).

In *Slaughter*, the defendant was observed engaging in what police officers believed to be a hand-to-hand drug transaction. *State* v. *Slaughter*, supra, 151 Conn. App. 342–43. Narcotics were later discovered in an apartment in which the defendant had been seen entering during the course of the transaction, and $1559 in cash was found on the defendant's person. Id., 343–44. In *Forde*, the police observed the defendant approach a truck, take money from the driver, and then discreetly give a signal to the defendant's associate, who then approached a nearby stone wall before handing an unidentified item to the driver. *State* v. *Forde*, supra, 52 Conn. App. 161. The police subsequently found $460 on the defendant's person. Id., 162. The police also retrieved a paper bag containing cocaine from the wall that the defendant's associate had approached, and the bag had the associate's fingerprints on it. Id., 162 and n.5.

Contrasting the circumstances in the present case with those in *Slaughter* and *Forde*, the defendant contends that "[t]he fact that neither money nor contraband were identified as part of the transaction [in the present case] establishes that they may only be labeled drug transactions by speculation." We disagree. Although the evidence deemed sufficient in *Slaughter* and *Forde* included certain facts and circumstances not found in the present case, nothing in those opinions indicates

that such evidence would be necessary in every case involving an observed hand-to-hand exchange. See *State* v. *Stephen J. R.*, 309 Conn. 586, 595 and n.8, 72 A.3d 379 (2013) (defendant's reliance on *State* v. *Thomas H.*, 101 Conn. App. 363, 922 A.2d 214 [2007], for proposition that victim's testimony must be corroborated to be sufficient to support sexual assault conviction, was misplaced; "[a]lthough the evidence deemed sufficient in [*Thomas H.*] included a bloodstain on the victim's underwear . . . nothing in the opinion indicates that the Appellate Court deemed this evidence relevant to its conclusion or that such evidence would be necessary in every case" [internal quotation marks omitted]). Moreover, the state in the present case did not rely solely on the hand-to-hand exchanges and the defendant's proximity to the contraband.

The street value of the heroin recovered, the particular location in which it was found, and the absence of other individuals observed in that location provide additional support for an inference that the defendant had been selling the heroin from the porch of 126–128 Walnut Street. As the state's expert on heroin sales, Officer Angon, testified, the street value of the heroin recovered was between approximately $1000 and $1150. Consequently, the jury reasonably could have concluded that, given the value of the drugs and their illicit nature, the most likely explanation for why they were found in plain view in a common area of the house was that whoever claimed ownership or possession of them had not simply left them there carelessly but, rather, had placed them there intentionally and actively was engaged in selling them. Given the testimony of Officers Phelan and Touponse that the defendant had been alone on the porch throughout the transactions and that no one else had been seen in the stairwell, the jury reasonably could have concluded further that it was the defendant who had been actively engaged in selling the drugs.

There was also testimony from Officers Phelan, Touponse, and Shaban that, on the day in question, the Waterbury Police Department had received a telephone call from an anonymous caller, stating that the defendant, whom the caller identified by first and last name, "was selling narcotics from the porch of [126–128] Walnut Street, and that he had a couple of warrants . . . ." Upon receiving this tip, the police confirmed that the defendant did indeed have several active felony warrants out for his arrest, and Phelan's subsequent drive-by confirmed that the defendant was indeed present on the porch of 126–128 Walnut Street. See *Navarette* v. *California*, 572 U.S. 393, 398, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) ("officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity"). The defendant did not object to the admission of this testimony as substantive evidence that the defendant was

selling drugs from the porch. Consequently, it "enter[ed] the case as part of the evidence and [could] be considered by the jury." *State* v. *Hickey*, 23 Conn. App. 712, 718, 584 A.2d 473, cert. denied, 217 Conn. 809, 585 A.2d 1233, cert. denied, 501 U.S. 1252, 111 S. Ct. 2894, 115 L. Ed. 2d 1058 (1991); see *Clougherty* v. *Clougherty*, 131 Conn. App. 270, 274, 26 A.3d 704, cert. denied, 302 Conn. 948, 31 A.3d 383 (2011).

Moreover, the defendant's flight from 126–128 Walnut Street upon seeing the police approach the front porch supports "an inference of consciousness of guilt, suggesting that the defendant knew of the presence and character of the narcotics . . . nearby . . . and sought to distance himself from them." *State* v. *Bischoff*, supra, 182 Conn. App. 573; see *State* v. *Jefferson*, 67 Conn. App. 249, 258, 786 A.2d 1189 (2001) ("[w]hen considered together with all the facts of the case, flight may justify an inference of the accused's guilt" [internal quotation marks omitted]), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). The defendant contends, however, that such an inference is unjustified in the present case because, at the time of his flight, there were several unrelated warrants out for his arrest, "suggesting a reason to flee the police [that] had nothing at all to do with any alleged illegal conduct on August 14, 2015." We are not persuaded.

Our Supreme Court rejected a similar argument in *State* v. *Kelly*, 256 Conn. 23, 57, 770 A.2d 908 (2001), noting: "[R]equiring the state to prove *which* crime caused a defendant to flee would place upon the [s]tate an impossible burden to prove that one charged with multiple violations of the law fled solely because of his consciousness that he committed one particular crime. *It is better logic to infer that the defendant, who is charged with several offenses, fled because of a conscious knowledge that he is guilty of them all*." (Emphasis in original; internal quotation marks omitted.) Thus, we conclude that the jury in the present case reasonably could have inferred from the defendant's flight that he possessed a guilty conscience with respect to both the conduct underlying his outstanding arrest warrants and the conduct underlying the present case.[9]

Considering this evidence together with the defendant's temporal and physical proximity to the narcotics recovered by the police, the jury reasonably could have inferred that the defendant had been selling those narcotics from the porch of 126–128 Walnut Street during the time in question. See *State* v. *Slaughter*, supra, 151 Conn. App. 347 (finder of fact reasonably could infer defendant's knowledge of presence of drugs in apartment from observations by police of apparent drug transactions, including his frequent trips to and from apartment in course of these transactions). By necessary implication, the jury reasonably could have concluded that the defendant was aware of the nature and

presence of the narcotics and had dominion and control over them. Accordingly, we conclude that the state presented sufficient evidence at trial to prove beyond a reasonable doubt that the defendant had constructive possession of the narcotics.

## II

The defendant next claims that the trial court deprived him of his constitutional right to present a defense under the sixth amendment to the United States constitution[10] by improperly excluding photographs of the front and back of the house. We disagree.

The following additional procedural history is relevant to this claim. During its case-in-chief, the state presented evidence regarding the police officers' views of the front and back of the house. Regarding the front of the house, Officer Phelan pointed out on a map the location where he had positioned himself during his undercover observation of the defendant and testified that he had had a clear view of the defendant from this position. During this testimony, the state's exhibit 2, a Google Maps photograph of the front of 126–128 Walnut Street, was admitted as a full exhibit by agreement of the parties. Exhibit 2 shows what appear to be one tree at the edge of the property line abutting Walnut Street and another, smaller tree at the edge of the property line abutting Catherine Avenue. Although the branches of the trees partially obstruct the view of the porch, the foliage as depicted in the exhibit is not dense, and the porch is largely visible. Phelan testified that this photograph depicts the house at roughly the same angle from which he had observed the defendant. Phelan could not say when the photograph was taken, but Officer Angon testified that it showed the house as it was at the time of the offenses in August, 2015. Angon did not state the basis for this assertion, and defense counsel did not cross-examine him on the matter.

Regarding the back of the house, Officer Shaban testified that while he and Officer Rose were positioned near the rear door, Rose alerted him that he had seen the defendant through a window descending the back staircase. Shaban did not testify regarding his own view of the back windows, and defense counsel did not cross-examine him on the matter. Nor did defense counsel call Rose to testify.

On October 13, 2016, during the defendant's case-in-chief, defense counsel sought to have two photographs of the house at 126–128 Walnut Street admitted into evidence. The first photograph is of the front of the house and depicts what appear to be two trees with lush foliage completely obstructing the view of the porch from which the defendant was purportedly observed by Officer Phelan engaging in the two hand-to-hand exchanges. The second photograph is of the back of the house and depicts one or more windows

on each story. According to defense counsel, this photograph demonstrates that there was no window through which Officer Rose could have observed the defendant running down the back staircase.

The state objected to the admission of these photographs, arguing that, because they had been taken in October, 2016—approximately fourteen months after the offenses occurred—they did not "fairly and accurately represent that location . . . ."[11] In other words, the state was concerned about the authenticity of the photographs. See *State* v. *Walker*, 180 Conn. App. 291, 326, 183 A.3d 1 (to satisfy authentication requirement, photograph "[must] be introduced through a witness competent to verify it as a *fair and accurate representation* of what it depicts" [emphasis added; internal quotation marks omitted]), cert. granted on other grounds, 328 Conn. 934, 183 A.3d 637 (2018). Specifically, the state noted its concern about the possibility that, during this fourteen month period, the condition of the trees could have changed and the house could have been remodeled.

As to the photograph of the front of the house, defense counsel offered to have the defendant testify that he is familiar with the property at 126–128 Walnut Street, that the photograph "accurately reflect[ed] the way the house and the tree looked"[12] when he took the photograph, and that "the way the tree looks in [his] photograph is substantially similar to the way it looked in August of 2014."[13] Defense counsel therefore argued that the state's concern regarding this photograph went to the weight of the evidence, not its admissibility. As to the photograph of the back of the house, defense counsel discounted the state's concern about the possibility of subsequent remodeling, noting that there was no evidence that any repair work had been done on the house. Defense counsel, however, made no offer of proof that such work had *not* been done or that the back of the house as depicted in the photograph looked substantially similar to the way it did at the time of the offenses.

The court issued its ruling from the bench, stating: "The court's concern is in the delay in the time frame of the photograph[s] and the concern that [these] photograph[s] [were] taken over one year from when the actual incident allegedly occurred here in this matter. Based upon that, I'm not considering [these] photograph[s] to be relevant at this time." Later in the proceeding, the court clarified that it had also excluded the photographs due to (1) the fact that the photographs were taken in the autumn whereas the offenses occurred during the summer and (2) the possibility that there may have been repairs to the property. The court did, however, permit the defendant to testify as to the condition of the house and trees at the time of the offenses.

On appeal, the defendant claims that the trial court committed evidentiary error and deprived him of his constitutional right to present a defense by excluding these two photographs. To resolve this claim we must determine, "[f]irst, whether the court's ruling was improper. *State* v. *Saunders*, 267 Conn. 363, 385, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004). Should we answer that question in the negative, we need go no further. Should we answer that question in the affirmative, the second question we must answer is whether that impropriety rises to the level of a constitutional violation. Id. Should we answer that question in the affirmative as well, the third question we must answer is whether the state has demonstrated that the constitutional impropriety was harmless beyond a reasonable doubt. *State* v. *William C.*, 267 Conn. 686, 706, 841 A.2d 1144 (2004). A negative answer to this third question will warrant a new trial. E.g., id., 709–10." *State* v. *Tutson*, 84 Conn. App. 610, 622, 854 A.2d 794 (2004), rev'd on other grounds, 278 Conn. 715, 899 A.2d 598 (2006). Alternatively, if the impropriety is not constitutional in nature, the burden is on the defendant to demonstrate that the evidentiary error was harmful. *State* v. *William C.*, supra, 706.

With this framework in mind, we next address each of the excluded photographs in turn.

A

Beginning with the photograph of the front of the house, we first must determine whether the trial court's ruling was improper. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 179 Conn. App. 734, 761, 181 A.3d 118, cert. denied, 328 Conn. 927, 182 A.3d 637 (2018).

The evidentiary ruling at issue in the present case implicates the requirement of authentication.[14] "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). This requirement applies to all types of evidence, including demonstrative evidence

such as photographs. See Conn. Code Evid. § 9-1 (a), commentary; *State* v. *Papineau*, 182 Conn. App. 756, 788, 190 A.3d 913, cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018). In order to satisfy the authentication requirement of § 9-1 of the Connecticut Code of Evidence, "[t]he proponent need only advance evidence *sufficient* to support a finding that the proffered evidence is what it is claimed to be." (Emphasis added; internal quotation marks omitted.) Conn. Code Evid. § 9-1 (a), commentary. In the case of photographs, "all that is required is that [the] photograph be introduced through a witness competent to verify it as a fair and accurate representation of what it depicts." (Internal quotation marks omitted.) *State* v. *Walker*, supra, 180 Conn. App. 326.

The defendant argues that his offer to testify to the appearance of the trees at the front of the property was sufficient to satisfy the authentication requirement and that, therefore, the photograph should have been admitted. According to the defendant, "[t]he fact that there is conflicting evidence as to the accuracy of [a photograph] does not require [its] exclusion. If the [witness] for the party offering the [photograph] testif[ies] that [it is] substantially correct [it] may be admitted, and [its] correctness then becomes a jury question." In other words, the defendant appears to argue that, in determining whether the authentication requirement has been met with respect to photographic evidence, the trial court's role is limited to ensuring that *sufficient* evidence of authenticity has been made and that it may not pass upon the *credibility* of such evidence.

The defendant's argument finds some support in appellate precedent. Our appellate courts consistently have described the evidentiary burden that must be met in order to satisfy the authentication requirement as "a prima facie showing of authenticity." See, e.g., *State* v. *Garcia*, 299 Conn. 39, 57, 7 A.3d 355 (2010) ("Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court." [Internal quotation marks omitted.]); *State* v. *Manuel T.*, 186 Conn. App. 51, 67–68, 198 A.3d 648 (2018) (same), cert. granted, 330 Conn. 968, 200 A.3d 189 (2019). As this court repeatedly has recognized, "[t]he phrase prima facie evidence means evidence which, *if credited*, is sufficient to establish the fact or facts which it is adduced to prove." (Emphasis added; internal quotation marks omitted.) *In re Cheyenne A.*, 59 Conn. App. 151, 158, 756 A.2d 303, cert. denied, 254 Conn. 940, 761 A.2d 759 (2000). Thus, our case law appears to suggest that the trial court's role in the context of the authentication requirement is to determine whether the proof of authenticity offered by the proponent of evidence is *sufficient* for the trier of

fact to find the evidence authentic—not whether, in the court's view, the proof of authenticity is *credible*. Indeed, it is well established, albeit in the context of a motion for a judgment of dismissal under Practice Book § 15-8, that a trial court may not pass upon the credibility of the evidence presented in determining whether a prima facie case has been made. See *Sonepar Distribution New England, Inc.* v. *T & T Electrical Contractors, Inc.*, 133 Conn. App. 752, 758, 37 A.3d 789 (2012).

The defendant's contention is further supported by our rules of evidence. Section 1-3 (a) of the Connecticut Code of Evidence provides in relevant part that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court." As noted in the commentary to § 1-3 (a), this rule operates in conjunction with the rules of evidence governing authentication: "The preliminary issue, decided by the court, is whether the proponent has offered a satisfactory foundation from which the finder of fact could reasonably determine that the evidence is what it purports to be. The court makes this preliminary determination in light of the authentication requirements of Article IX [of the Connecticut Code of Evidence]. Once a prima facie showing of authenticity has been made to the court, the evidence, if otherwise admissible, goes to the fact finder, and it is for the fact finder ultimately to resolve whether evidence submitted for its consideration is what the proponent claims it to be." Conn. Code Evid. § 1-3 (a), commentary.

Ultimately, however, we need not definitively determine whether the trial court in the present case improperly excluded the photograph of the front of the house. Even if we assume that the photograph was excluded improperly, we cannot conclude that such impropriety rose to the level of a constitutional violation. "[T]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Internal quotation marks omitted.) *State* v. *Jackson*, 183 Conn. App. 623, 655–56, 193 A.3d 585, cert. granted on other grounds, 330 Conn. 922, 193 A.3d 1214 (2018).

Whether a trial court's exclusion of evidence offered by a criminal defendant deprives him of his constitutional right to present a defense "is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense

is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014). Moreover, "[a] defendant may not successfully prevail on a claim of a violation of his right to present a defense if he has failed to take steps to exercise the right or if he adequately has been permitted to present the defense by different means. See *State* v. *Tomas D.*, 296 Conn. 476, 498, 995 A.2d 583 (2010) ('a defendant may not successfully establish a violation of his [right] to present a defense . . . without first taking reasonable steps to exercise [that right]'), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 564, 34 A.3d 370 (2012); *State* v. *Shabazz*, 246 Conn. 746, 758 n.7, 719 A.2d 440 (1998) (no deprivation of constitutional right to present defense when 'defendant was adequately permitted to present his claim of self-defense by way of his own testimony, by cross-examining the state's witnesses, and by the opportunity to present any other relevant and admissible evidence bearing on that question'), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999)." *State* v. *Santana*, 313 Conn. 461, 470–71, 97 A.3d 963 (2014).

In the present case, the defendant argues that the photograph of the front of the house was central to his arguments regarding misidentification and lack of possession because it "would have considerably undercut" Officer Phelan's testimony that he had a sufficiently good view of the porch to be able to recognize the suspect as the defendant and to observe him walk into the house where the drugs were found before engaging in two hand-to-hand exchanges. The state counters that the defendant was not deprived of his right to present his defenses because he was adequately permitted to present the defenses by different means and there were additional, alternative avenues that he could have taken to exercise his right. We agree with the state.

In support of his misidentification argument, the defendant was able to testify that (1) there are two berry trees at the front of 126–128 Walnut Street that block the entire front of the house in July and August, (2) a person standing at the intersection of Cosset and Walnut Streets where Phelan had been positioned would not have been able to see the front porch in August, 2015, (3) he had not been on the porch of 126–128 Walnut Street on the day in question, (4) he has been unable to run since being injured in an automobile accident in 2009, and (5) upon being arrested in February, 2016, he never acknowledged having run away from the police on the day in question. In addition, defense counsel was able to elicit during his cross-examination of Officer Phelan that Phelan had been positioned so far away from the porch that he had required binoculars to observe the defendant. Defense counsel also was able to elicit from Phelan that the person he had observed

on the porch had been wearing a blue tank top, shorts, and a baseball hat, whereas one of the defendant's witnesses, Castille Morales, testified that she had been present in the second floor apartment of 126–128 Walnut Street at the time in question when a man dressed in a black or blue hoodie and long black pants ran through the apartment. Morales, who is the grandmother of the defendant's wife, also testified that the man who ran through her apartment was taller than the defendant and that, in the five or six years that she had known the defendant, she had never seen him running.

In support of the defendant's argument that he did not possess the narcotics, defense counsel was able to cross-examine Phelan regarding his inability to identify the items exchanged during the two suspected hand-to-hand transactions and the fact that police made no attempt to identify or arrest the two suspected narcotics buyers. Defense counsel also elicited testimony from Officer Touponse that he had not seen the suspect throw anything away as he chased the suspect into the house. Moreover, the defendant testified that no drugs, money, or paraphernalia were found on him when he was arrested.

There also were additional avenues that the defendant could have pursued to support his defenses. He could have cross-examined Phelan regarding the appearance of the foliage on the day in question and cross-examined Angon regarding the basis for his testimony that the photograph of the front of the house submitted into evidence by the state represented the appearance of the foliage on the day in question. He also could have questioned Morales and Carmen Cruz[15]—both of whom testified for the defense and claimed to have lived at 126–128 Walnut Street—regarding the appearance of the foliage.

In sum, we agree with the state that the defendant was able to adequately present his defenses of misidentification and lack of possession by other means and had additional, alternative avenues available to him to further bolster his defenses. Accordingly, we conclude that the exclusion of the defendant's photograph of the front of 126–128 Walnut Street did not deprive him of his constitutional right to present a defense.

Because the defendant has not established that the exclusion of the photograph rose to the level of a constitutional violation, the burden is on the defendant to demonstrate that the alleged evidentiary error was harmful. See *State* v. *William C.*, supra, 267 Conn. 706 ("If . . . a constitutional right is implicated [by the improper exclusion of defense evidence], [t]he state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . Conversely, if the evidentiary impropriety is not constitutional in nature, the defendant bears the burden

of demonstrating harm." [Citation omitted; internal quotation marks omitted.]). The defendant has failed to meet that burden.

"[W]hether [the improper exclusion of defense evidence] is harmless in a particular case depends upon a number of factors, such as the importance of the [excluded evidence] in the . . . case, whether the [evidence] was cumulative, the presence or absence of [other] evidence corroborating or contradicting the [excluded evidence] on material points . . . and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State v. Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014).

The defendant argues that the evidentiary error was harmful because the state's case was weak in that it relied solely on the testimony of police officers that would have been undermined had the defendant's photograph of the front of the house been admitted into evidence. More specifically, the defendant asserts that the state's proof of identity and possession depended primarily on Officer Phelan's testimony that he had observed the defendant entering and exiting the house from the front porch of 126–128 Walnut Street before engaging in two hand-to-hand transactions, which testimony, according to the defendant, would have been called into doubt by his excluded photograph.[16] We disagree.

Having reviewed the record in the present case, we have a fair assurance that any impropriety in excluding the defendant's photograph of the front of 126–128 Walnut Street did not substantially affect the verdict in this case. First, contrary to the defendant's suggestion, the state did not rely solely on Officer Phelan's testimony to prove identity and possession. As to the issue of identity, Officer Touponse testified that he had been familiar with the defendant from prior encounters with him and had reviewed photographs of the defendant immediately prior to approaching 126–128 Walnut Street and that, upon approaching the front of the property, he had observed the defendant on the porch wearing a blue tank top, shorts, and a baseball cap. Officer Shaban similarly testified that he had been familiar with the defendant from prior interactions with him and that, while waiting at the back of the property during the time in question, he had observed the defendant, dressed in a blue shirt and baseball cap, attempt to exit the house from the back door. Shaban also testified that, during

the subsequent search of the building, the residents of the second floor apartment, Ronnie Morales and Brenda Rivera, had related to him that the defendant had passed through their apartment. Moreover, the defendant testified that he often visits family members at 126–128 Walnut Street and will sometimes "hang out" on the front porch. Indeed, the grandmother of the defendant's wife, Castille Morales, confirmed that he hangs out on the front porch between one to three times a week. Thus, there was substantial evidence aside from Phelan's testimony tending to prove the defendant's identity as the suspect seen fleeing police at 126–128 Walnut Street.

On the issue of possession, we first note that, had the state relied exclusively on the defendant's temporal and spatial proximity to the narcotics and Phelan's observation of the hand-to-hand exchanges, the exclusion of evidence tending to undermine the accuracy of Phelan's observation likely would have had a significant impact on the jury's verdict. If such were the case, the defendant's reliance on *State* v. *Nova*, supra, 161 Conn. App. 708, would be well taken. See id., 724 (without evidence of any items changing hands, defendant's mere proximity to contraband was insufficient to support finding of constructive possession). In the present case, however, the state also presented police testimony regarding an anonymous telephone call that the Waterbury Police Department had received earlier in the day. The caller informed the police that the defendant, whom the caller identified by first and last name, was selling narcotics from the porch of 126–128 Walnut Street and had active warrants out for his arrest. The police confirmed the existence of several active felony warrants, and Officer Touponse confirmed that the defendant was present on the porch when he and the other officers approached the front of 126–128 Walnut Street. The defendant did not object to the admission of this testimony, and, accordingly, the jury was entitled to consider this evidence in conjunction with the other evidence of possession noted in part I of this opinion. Thus, even without Phelan's testimony regarding the two hand-to-hand exchanges, there was compelling evidence of the defendant's constructive possession of the narcotics.

We also disagree with the defendant's contention that the excluded photograph likely would have significantly undermined Phelan's testimony that he had had a clear view of the porch of 126–128 Walnut Street, as there was strong evidence corroborating Phelan's testimony. In the photograph of the front of the house offered by the state, which was admitted into evidence by agreement of the parties, the front porch is clearly visible. In addition, the descriptions of the defendant's clothing given by Officers Touponse and Shaban, whose views of the suspect were unobstructed, matches that given by Phelan. Moreover, the defendant conceded at trial

that the front porch was not obstructed from every angle. More specifically, he testified that, whereas one can see only "peeks" of Walnut Street from the porch, Catherine Avenue was "somewhat" visible. Given Phelan's testimony that he had been able to see a car pull up and park on the corner of Catherine Avenue, the defendant's concession that the porch was somewhat visible from Catherine Avenue tends to support Phelan's testimony that he had had a clear view of the porch.

In light of the foregoing circumstances, we are not persuaded that the exclusion of the photograph of the front of the house substantially affected the jury's verdict.

B

The defendant also claims that the court improperly excluded the photograph of the back of the house and thereby deprived him of his ability to present his misidentification defense. We conclude that, because the defendant failed to authenticate this photograph, the trial court properly excluded it.

At trial, defense counsel represented to the court that the defendant was prepared to testify that the *front of the house* as depicted in his photograph looks substantially similar to the way it looked at the time of the offenses. Defense counsel made no similar offer of proof with respect to the photograph of the back of the house. The defendant, therefore, failed to make the prima facie showing required to authenticate the photograph of the back of the house, and, consequently, the trial court properly excluded it. Because we conclude that the trial court's evidentiary ruling was proper, "we need go no further." *State* v. *Tutson*, supra, 84 Conn. App. 622.

III

Finally, the defendant claims that the court improperly prevented him from displaying a scar to the jury and that this deprived him of his constitutional right to present his misidentification defense. We disagree.

The following additional facts and procedural history are relevant to this claim. During his case-in-chief, the defendant testified that he had undergone spinal surgery in 2009 after shattering his spine in an automobile accident. As summarized in his Waterbury Hospital medical records, which were admitted into evidence by agreement, the defendant sustained several vertebral fractures in the accident. In order to treat an unstable compression fracture to one of the vertebrae, a posterior spinal fusion was performed. As detailed in the surgeon's report, the procedure required "[a] midline longitudinal incision . . . from the low thoracic region down into the lumbar area," which was closed with staples following the procedure. As to the defendant's postsurgical prognosis, the surgeon stated in his report that he "would anticipate some long-term aches and

pains" but that, "typically, these types of injuries heal sufficiently so that people can return to a productive and active lifestyle." Despite this prognosis, the defendant testified at trial that he was no longer able to run.

The defendant further testified that the surgery had left him with a scar on his back, whereupon defense counsel requested the court's permission for the defendant to display the scar to the jury. The state objected, arguing that the defendant already had testified regarding his condition and that the scar was irrelevant. The court sustained the state's objection on the ground that demonstrating the scar to the jury would be cumulative, ruling: "I think just the defendant's testimony regarding the scar itself . . . is sufficient. I don't think it's necessary for him to demonstrate that to the jury at this time . . . ."

On appeal, the defendant claims that the court improperly excluded this evidence as cumulative[17] and thereby deprived him of his right to present a defense, namely, that he was misidentified as the suspect seen running from the police at 126–128 Walnut Street. As explained in part II of this opinion, such a claim requires us to first determine the propriety of the court's ruling. See *State* v. *Tutson*, supra, 84 Conn. App. 622. On this point, the defendant argues, in relevant part, that demonstration of his scar would not have been cumulative because, "although [he] was able to admit his medical records into evidence, these records did not describe the current condition of his back."[18] We are not persuaded, and, accordingly, "we need go no further" in addressing the defendant's claim. *State* v. *Tutson*, supra, 84 Conn. App. 622.

"Evidence may be precluded if its probative value is outweighed by the 'needless presentation of cumulative evidence.' Conn. Code Evid. § 4-3. Evidence is cumulative if it multiplies witnesses or documentary matter to any one or more facts that were the subject of previous proof. . . . The court's power in that area is discretionary. . . . In precluding evidence solely because it is cumulative, however, the court should exercise care to avoid precluding evidence merely because of an overlap with the evidence previously admitted." (Citations omitted.) *Glaser* v. *Pullman & Comley, LLC*, 88 Conn. App. 615, 627, 871 A.2d 392 (2005). Nevertheless, "[b]ecause of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Morquecho*, 138 Conn. App. 841, 853–54, 54 A.3d 609, cert. denied, 307 Conn. 941, 56 A.3d 948 (2012); see *State* v. *Gutierrez*, 132 Conn. App. 233, 237, 31 A.3d 412 (2011) ("[t]he trial court is vested with wide and liberal discretion in

determining the admissibility of evidence claimed to be repetitious, remote or irrelevant" [internal quotation marks omitted]).

In the present case, the defendant's medical records established that the spinal surgery he underwent had required an incision that had to be stapled closed after the surgery. As the defendant notes, the medical records do not disclose "the current condition of his back." Nevertheless, the jury reasonably could have inferred from this evidence that the surgery left a scar on the defendant's back; it is a matter of common knowledge that surgical incisions generally leave permanent scars. At any rate, the jury in this instance had no need to rely solely on inferences—the defendant explicitly testified that, as a result of the spinal surgery, he now has a scar on his back. The state did not contest this aspect of the defendant's testimony, and, therefore, the trial court found it unnecessary to have the defendant demonstrate the scar to the jury. Under these circumstances, we cannot conclude that it was an abuse of discretion for the court to exclude the demonstration as needlessly cumulative. See *State* v. *Book*, 155 Conn. App. 560, 574, 109 A.3d 1027 (notice of appeal form offered by defendant was properly excluded on ground that it represented needless presentation of cumulative evidence where he "had already testified that he had appealed from the prior convictions, and the court found it unnecessary to admit the notice of appeal form"), cert. denied, 318 Conn. 901, 122 A.3d 632 (2015), cert. denied, U.S. , 136 S. Ct. 2029, 195 L. Ed. 2d 219 (2016).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also was convicted of interfering with an officer in violation of General Statutes § 53a-167a. He does not challenge this conviction on appeal.

[2] As relief under this claim, the defendant seeks reversal of his conviction and a judgment of acquittal on the narcotics related charges and the charge of possession of drug paraphernalia. The defendant, however, does not separately analyze the question of sufficiency of the evidence of possession of drug paraphernalia. Accordingly, neither do we.

[3] The house is located on the northeast corner of the intersection of Catherine Avenue and Walnut Street.

[4] At the top of the staircase, a hallway extending to the right leads to the front door of the second floor apartment. From this point, the hallway extends to the right parallel to the first stairwell and leads to a stairway to the third floor.

[5] The record does not identity Officer Rose's first name.

[6] The defendant moved for a judgment of acquittal after the state's case-in-chief and again upon the conclusion of all of the evidence. The court denied both motions.

[7] The defendant was sentenced to a total effective sentence of twenty years of incarceration, execution suspended after ten years, eight years of which are mandatory, followed by five years of probation.

[8] The evidence supporting such an inference is as follows. The police recovered 171 bags of heroin and a digital scale from the second floor landing at 126–128 Walnut Street. The heroin was packaged in bundles of ten glassine packets, tied with rubber bands, and packed in rice. According to Officer Gary Angon, an expert on heroin sales, heroin sellers typically possess the drug in quantities larger than that usually possessed by an individual user—often in conjunction with a scale—and typically package the drug in individual bags or ten bag bundles tied by rubber bands. Angon

also testified that sellers typically use substances like rice to protect the drugs from being ruined by moisture. In Angon's expert opinion, someone in possession of 171 bags of heroin is likely a dealer.

[9] The defendant further argues that no inference of consciousness of guilt was warranted in the present case because, rather than run *away* from the contraband when the police approached, he ran *toward* it. See *State* v. *Bischoff*, supra, 182 Conn. App. 573 ("[t]he defendant's act of running *away* upon the officers' entry reasonably could have been found to support an inference of consciousness of guilt, suggesting that the defendant knew of the presence and character of the narcotics on the nearby TV stand and sought to *distance* himself from them" [emphasis added]). We are not persuaded. The jury reasonably could have determined that, given the defendant's position on the front porch when the police approached him, his only viable path away from the scene of the crime was through the house. Consequently, the fact that this path led past evidence of the crime does not render unreasonable an inference of consciousness of guilt.

[10] "A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . [which] are made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 272 n.3, 96 A.3d 1199 (2014). The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."

[11] With respect to the photograph of the front of the house in particular, the state noted that the defendant's photograph was "a complete[ly] different photograph from the Google Earth map of August, 2015, when this incident occurred" and argued that its prejudicial effect, therefore, outweighed its probative value.

[12] It is unclear from the transcript which tree defense counsel was referring to.

[13] Presumably, defense counsel meant August, 2015, the date of the offenses.

[14] The basis for the state's objection to the admission of the photographs was the lack of authentication. The court, in excluding the evidence, echoed the substance of the state's objection but couched its ruling in terms of relevancy. "Authentication and identification are *aspects of relevancy* that are a condition precedent to admissibility." (Emphasis added; internal quotation marks omitted.) *State* v. *Morales*, 78 Conn. App. 25, 47–48, 826 A.2d 217, cert. denied, 266 Conn. 901, 832 A.2d 67 (2003); see E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 9.1.2 ("[t]o be relevant, all items of evidence offered as exhibits must be authenticated"). Accordingly, we construe the trial court's ruling as being based in the requirement of authentication more specifically.

[15] Cruz testified that she is the defendant's aunt and lives in the first floor apartment at 126–128 Walnut Street.

[16] The defendant appears to totally discount the testimony of Officers Touponse and Shaban identifying the suspect as the defendant because, according to the defendant, these officers "saw the suspect for mere seconds, as he ran."

[17] The defendant also claims that his scar was relevant demonstrative evidence and that, therefore, it was improper for the court to exclude it. The court, however, did not exclude the evidence on the basis of relevancy; the court excluded it on the ground that it was cumulative. Consequently, we need not determine whether such evidence was relevant. Our review is limited to determining whether the court properly excluded the evidence of the scar as cumulative.

[18] The defendant also claims that demonstration of his scar would not have been cumulative of his trial testimony because the prosecutor, during cross-examination, "continuously, and incorrectly, discounted the seriousness of the defendant's injuries." This claim is unreviewable. The defendant sought to demonstrate his scar to the jury during *direct examination*, and the court ruled on the admissibility of the proposed demonstration on the basis of the facts and circumstances then existing. Following the prosecutor's cross-examination, the defendant did not ask the court to reconsider its prior ruling. Thus, the defendant's claim, that the prosecutor's line of questioning during cross-examination somehow rendered demonstration of his scar no longer cumulative, was never presented to the court. "Our rules of practice require a party, as a prerequisite to appellate review, to

distinctly raise its claim before the trial court. See Practice Book § 5-2 ('[a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority'); Practice Book § 60-5 ('[t]he [reviewing] court shall not be bound to consider a claim unless it was distinctly raised at trial or arose subsequent to trial'). For that reason, we repeatedly have held that 'we will not decide an issue that was not presented to the trial court. To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge.' " *Samuel* v. *Hartford*, 154 Conn. App. 138, 145–46, 105 A.3d 333 (2014). We, therefore, decline to consider the defendant's claim.

---